**GOSS GRAPHICS SYSTEM, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

Slip Op. 98–147.
Court No. 96–10–02314.

United States Court of International Trade.

Oct. 16, 1998.

Kirkland & Ellis, (Kenneth G. Weigel), for Plaintiff Koenig & BauerAlbert, AG, and KBA–Motter Corp.; Shearman & Sterling, (Thomas B. Wilner, Jeffrey M. Winton, Michael J. Chapman), for Plaintiffs MAN Roland Druckmaschinen AG and MAN Roland Inc.; Steptoe & Johnson LLP, (Richard O. Cunningham, Edward J. Krauland, Daniele J. Plaine, Eric C. Grimm), for Plaintiff Mitsubishi Heavy Industries; Perkins Coie LLP (Yoshihiro Saito) and Farkas & Manelli (Richard Toikka), Washington, DC, for Plaintiff Tokyo Kikai Seisakusho, Ltd.

Lyn. M. Schlitt, General Counsel, James A. Toupin, Deputy General Counsel, Neal J. Reynolds, Office of the General Counsel, U.S. International Trade Commission, Randi Rimerman Serota, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, for Defendant.

Wiley, Rein & Fielding, (Pujo,leslie Charles Owen Verrill, Jr., Alan H. Price, Leslie Johnson Pujo), Washington, DC, for Goss Graphics Systems, Inc., DefendantIntervenor.

### OPINION

POGUE, Judge.

This action is before the Court on Plaintiffs' motions for judgment on the administrative record pursuant to USCIT Rule 56.2. Plaintiffs Koenig & Bauer–Albert AG and KBA–Motter Corp. ("KBA"), MAN Roland Druckmaschinen AG and MAN Roland Inc. ("MAN Roland"), Mitsubishi Heavy Industries, Ltd. ("MHI") and Tokyo Kikai Seisakusho, Ltd. ("TKS"), respondents in the underlying investigation, seek review of the final determination of the U.S. International Trade Commission ("ITC" or "Commission"), in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany and Japan,* Inv. Nos. 731–TA736 & 737, USITC Pub. No. 2988 (Aug.1996)("Final Determination"). Specifically, Plaintiffs challenge the ITC's determination that the industry in the United States producing large newspaper printing presses ("LNPPs") is threatened with material injury by reason of imports from Germany and Japan that are sold at less than fair value ("LTFV").[1] The German Plaintiffs also challenge the Commission's decision to cumulate imports of LNPPs from Germany and Japan for purposes of its material injury and threat of material injury analysis.[2]

### Background

LNPPs are presses that are designed to print major daily papers for large metropolitan newspapers. LNPPs are capable of producing tens of thousands of newspapers per hour. They have a long life-expectancy and must be extremely reliable. LNPPs are individually designed to meet each newspaper's requirements and require sophisticated engineering, programming and manufacturing capabilities. Their design, construction and installation generally require long-term contracts covering all aspects of sale, delivery and construction.

In its determination, the ITC found that there was a single domestic industry, consisting of all LNPP producers of the domestic like product. Included in the domestic industry were Goss, the petitioner in the underlying investigation, as well as three LNPP producers that are owned or controlled by foreign LNPP manufacturers.

### Standard of Review

In reviewing the Commission's determination, the Court must sustain a final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(1994).

### Discussion

### I. Cumulation

■ In making its injury determination, the ITC may "cumulate"—i.e., consider the

---

1. The Plaintiffs in this case filed separate actions challenging certain aspects of the Final Determination. The actions were consolidated under Consol. Court No. 96–10–02314. Accordingly, the case caption represents the lead consolidated case in this proceeding.

2. The Japanese Plaintiffs have not taken a position with respect to the cumulation arguments made by the German Plaintiffs.

impact of imports from more than one country on the domestic industry—only if those imports "compete with each other and with domestic like products in the United States market." Section 771 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677(7)(G)(i),(H)(1994). In order to satisfy this provision, the ITC must determine that "a reasonable overlap of competition" exists between imports from different countries. *Wieland Werke, AG v. United States*, 13 CIT 561, 563, 718 F.Supp. 50, 52 (1989). "Completely overlapping markets are not required." *Id.*

German Plaintiffs argue that the ITC's cumulation decision was premised on the finding that during the investigation period, " 'the German producers submitted *final bids* in direct competition with one or both of the Japanese producers on sales of LNPP press lines ... accounting for [a significant percentage] of the total final contract value of all LNPP press line contracts awarded....' " Mem. MAN Roland and Koenig & Bauer–Albert Support Mot. J. Agency R. ("Cumulation Brief") at 8 (emphasis in the original)(quoting Views of the Commission, List 2, Doc. 429M ("Views") at 36). Therefore, Plaintiffs argue, the decision to cumulate was inappropriate, because "[t]here was no competition between German and Japanese producers at the final bidding stage during the entire period of investigation." Cumulation Brief at 12.

■ However, the ITC's decision to cumulate German and Japanese imports was based on a variety of considerations. Specifically, in evaluating whether imports from different countries compete with each other and with the domestic like product, the ITC relies on a four-factor test. The four factors are as follows:

(1) the degree of fungibility between the imports from different countries and between imports and the domestic like product, including consideration of specific customer requirements and other quality related questions;

(2) the presence of sales or offers to sell in the same geographical markets of imports from different countries and the domestic like product;

(3) the existence of common or similar channels of distribution for imports from different countries and the domestic like product; and

(4) whether the imports are simultaneously present in the market.

Views at 32. *See Wieland Werke*, 13 CIT at 563, 718 F.Supp. at 52; *Fundicao Tupy S.A. v. United States*, 12 CIT 6, 10–11, 678 F.Supp. 898, 902 (1988), *aff'd*, 859 F.2d 915 (Fed.Cir.1988). "While no single factor is determinative, and the list of factors is not exclusive, these factors are intended to provide the Commission with a framework for determining whether the imports compete...." Views at 32 (citing *Wieland Werke*, 13 CIT at 563, 718 F.Supp. at 52). Plaintiffs do not directly challenge the ITC's four-factor test.

■ Evaluating the four factors, the Commission observed that, "during the period of investigation, subject imports from Germany and Japan ... were generally sold in similar channels of trade since the large majority of German and Japanese subject imports ... was sold directly by the manufacturer of the merchandise to the customer." Views at 33–34. As evidence for this assertion, the ITC cites the Staff Report in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany and Japan*, Inv. Nos. 731–TA–736 & 737 (Final), List 2, Doc. 311M (Aug. 7, 1996) ("Staff Report") at I–15 ("LNPPs and additions are sold directly to the end user....").[3]

With respect to the simultaneous presence of the imports in the market, the ITC stated, "we examined the extent of simultaneous presence of subject imports from Germany and Japan in terms of both sales and offers to sell ... as well as actual imports entering the United States, because the bidding process is the point at which head-to-head competition occurs." Views at 34. The ITC

---

**3.** For citation purposes, "List 1, Doc. ___" denotes the document number assigned in the Public Administrative Index filed in this action by the Commission while "List 2, Doc. ___" denotes the document number assigned the Confidential Administrative Record Index.

found that subject importers were actively bidding for sales of press lines and additions in every year of the period examined. *Id.* As evidence, the ITC cites the Staff Report at V–11 to V–16 and V–28 to V–62. The cited pages contain tables and text describing domestic LNPP sales during the period of investigation. These descriptions demonstrate that even if German and Japanese manufacturers were not competing against each other at the final bid stage for specific sales, as Plaintiffs claim, producers from both countries were actively bidding for sales of press lines and additions during the period examined. Furthermore, "subject merchandise entered the United States from both Germany and Japan in 1991, 1994 and 1995." *Id.* This statement is supported by a table in the staff report listing U.S. imports of LNPPs for 1991–95. *See* Staff Report at IV–4, Table IV–3.

With regard to the "presence of sales or offers to sell in the same geographical markets," the ITC found that "the record evidence indicates that German, Japanese and domestic producers are not limited by geographic boundaries with respect to their submission of bids and are therefore able to—and do—submit bids on LNPP projects throughout the nation." Views at 34–35. This statement also is borne out by the staff report. *See* Staff Report at V–28 to V–62.

Finally, considering the remaining factor, the degree of fungibility of imports from different countries, the Commission said,

> in a number of cases, ... RFQs [requests for quotations] were sent to domestic and German and Japanese LNPP producers, and initial bids, which are themselves detailed descriptions of the products being offered, were often submitted by these producers. The fact that purchasers solicited detailed initial bids from both German and Japanese producers ... indicates to us that purchasers perceived a reasonable degree of fungibility among various producers' presses....

Views at 35–36.

In response, the Plaintiffs argue that the German and Japanese manufacturers did not compete at the final bid stage, and therefore, cannot be considered to have been in compe-

tition at all. Implicit in Plaintiffs' argument is the view that only "direct competition" may be considered by the ITC in making a cumulation determination. *See Cumulation* Brief at 12 (arguing that certain sales did not involve "direct competition" between German and Japanese producers and therefore should not be included in the ITC's cumulation analysis). Plaintiffs imply that the Commission's four-factor analysis was largely irrelevant because the presses can only be considered to be in competition at the final bid stage.

Plaintiffs explain their reasoning as follows: "newspapers explore their options very carefully [prior to purchasing a new press].... Purchasers often request initial bids from various producers as part of an 'education or information-gathering' process in order to determine the options available in the marketplace." Cumulation Brief at 7. After reviewing the initial bids, the purchaser will exclude certain producers " 'due to their perceived inability to satisfy technological or other customer requirements.' " *Id.* at 8 (quoting Views at 21). Once the purchaser has chosen the producer or producers it believes are capable of meeting its requirements, the newspaper "seeks final bids and engages in detailed negotiations with the producer or producers...." *Id.* It is only at the final bidding stage, Plaintiffs argue, "that presses offered are comparable and can be reasonably considered in competition with one other." *Id.*

> However, the ITC maintains that,
>
> we do not interpret the differences in technology offered by different producers to be, in and of themselves, sufficient to warrant a conclusion that no reasonable overlap of competition exists .... a particular purchaser's ultimate preference for one producer's press over another's due to technology or quality differences does not mean that those presses do not compete with each other.

Views at 37.

The Court agrees with the Commission. "[C]umulation does not require two products to be highly fungible. Rather, to support a decision to cumulate, the Commission need only find a 'reasonable overlap' of competi-

tion...." *BIC Corp. v. United States,* 21 CIT ——, ——, 964 F.Supp. 391, 400 (1997). Furthermore, the Court finds that this case is similar to *Granges Metallverken AB v. United States,* 13 CIT 471, 716 F.Supp. 17 (1989). In that case, the ITC stated that "although a custom product delivered to the customer may be unique, there is competition in [the] industry because other producers also sought to sell that same merchandise to the same customer...." 13 CIT at 475, 716 F.Supp. at 21. The court agreed:

> [a]lthough quality appeared to be a major factor in purchaser's decisions, price was also a major factor. It is not unreasonable for the Commission to find that domestic purchasers prefer to purchase higher quality goods that are available at a cheaper price than domestic goods or other imports perceived to be inferior. "Competition" consists of rivalry in the marketplace, where goods will be bought from those who, in view of buyers, provide "the most for the money."

*Id.* at 476–77, 716 F.Supp. at 22 (citing J.P. Friedman, Dictionary of Business Terms 109 (1987)). In this case, the ITC found that "[a]ll producers produce and offer offset LNPPs and have developed (or are in the process of developing) keyless inking technologies...." Views at 37. Thus, the Commission's determination that producers could be considered to be in competition with each other based on competition at the initial stages of bidding, even if they did not compete at the final bid stage, was supported by substantial evidence.

In addition to its four-factor analysis, the Commission also argued that "there was a significant degree of head-to-head competition between subject imports from Germany and Japan at [the final bid] stage as well,...." Views at 36. Specifically, the Commission found that German and Japanese producers competed at the final bid stage for a small number of LNPP press line sales with a total final contract value in excess of $125 million. *Id.* n. 181. As support for this finding, the Commission cites Table V–1 in the staff report, captioned, "[f]inal-bid price information by bidding firm and purchaser...." Staff Report at V–11 to V–13.

However, the term "final-bid price" in the caption to the table is ambiguous. It could mean, as the government argues, bids submitted at the final bid stage, or it could simply mean the final bid submitted by the producer in question. Based on other evidence contained in the record, the latter definition seems more likely.

For example, for the sale by MHI to the *Washington Post,* one of the sales relied on by the Commission, the table lists final bids submitted by Goss, TKS, and KBA. *Id.* at V–12. However, in its description of the bid process, the purchaser states that one of the three competitors "fell out of the running early." Staff Report, App. G at 18. The staff report states that one of the three "[was] not included in the final bidding." Staff Report at V–54 n. 80. Similarly, the table lists a final bid for one German producer. However, according to the staff report, the German producer also was not included in the final bidding. *Id.* Thus, although the Court agrees that the German producer was in competition for the sale, the evidence indicates that the producer was eliminated before the final bid stage.

Another of the sales relied on by the ITC was the sale by MAN Roland to the *Wilkes-Barre Leader.* As with the *Washington Post* sale, Table V–1 lists final bids from both Japanese and German manufacturers for that sale. Staff Report at V–12. However, the staff report indicates that prior to the final bid stage, the newspaper narrowed its consideration to two of the competitors. Staff Report at V–54.

The remaining sales relied on by the ITC for its findings regarding competition at the final bid stage comprise less than five percent of total contract value during the period of investigation. Staff Report at V–11—V–13.

At oral argument, government's counsel explained that table VI–1 includes not "final bids" but bids submitted at the "final stage" defined as all bidding after the initial bids were submitted. Regardless of the correct definition of "final-bid price," the Court finds that the Commission's findings regarding competition at the final bid stage constituted

a relatively insignificant part of the Commission's findings overall.

The Commission's cumulation decision was premised on the four factors set out above. Based on the Commission's evaluation of those factors, the Court finds that the Commission had substantial evidence supporting its determination that a reasonable overlap of competition existed between the German and Japanese manufacturers.

## II. The ITC's Threat Determination

### A. The ITC's Consideration of Economic Factors

■ In determining whether an industry in the United States is threatened with material injury by reason of imports, (or sales for importation) of the subject merchandise, the ITC is required to consider, "among other relevant economic factors," the following nine factors:

(I) if a countervailable subsidy is involved, such information as may be presented to it by the administering authority as to the nature of the subsidy....

(II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports,

(III) a significant rate of increase of the volume or market penetration of imports of the subject merchandise indicating the likelihood of substantially increased imports,

(IV) whether imports of the subject merchandise are entering at prices that are likely to have a significant depressing or suppressing effect on domestic prices, and are likely to increase demand for further imports,

(V) inventories of the subject merchandise,

(VI) the potential for product-shifting if production facilities in the foreign country,

which can be used to produce the subject merchandise, are currently being used to produce other products,

(VII) in any investigation under this title which involves imports of both a raw agricultural product ... and any product processed from such raw agricultural product ...,

(VIII) the actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(IX) any other demonstrable adverse trends that indicate the probability that there is likely to be material injury by reason of imports (or sale for importation) of the subject merchandise (whether or not it is actually being imported at the time).

19 U.S.C. § 1677(7)(F)(i).[4]

Furthermore, the ITC is to "consider the factors set forth [above] as a whole in making a determination of whether further dumped ... imports are imminent and whether material injury by reason of imports would occur unless an order is issued...." 19 U.S.C. § 1677(7)(F)(ii).

■ According to the Court of Appeals for the Federal Circuit, "[a]n affirmative injury determination requires both (1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." *Gerald Metals, Inc. v. United States,* 132 F.3d 716, 719 (Fed.Cir.1997). The section of the antidumping statute that discusses the threat factors also includes the "by reason of" language. Thus, a positive threat determination also requires a showing of a causal connection between the LTFV goods and the threatened material injury. *Id.* at 720.

Therefore, after considering all relevant economic factors in making a determination of whether further dumped imports are imminent, the Commission must take an analytically distinct step to comply with the "by

---

4. Factor I, regarding information on subsidies, is not significant to this investigation because this case involves allegations of dumping, not subsidization. Factor V, existing inventories of subject

merchandise, is also relatively insignificant because LNPPs are sold on a made-to-order basis. Finally, Factor VII is not significant because this case does not involve any agricultural product.

reason of" standard: the Commission must determine whether these factors as a whole indicate that the LTFV imports made a material contribution to the threat of the material injury. "[E]vidence of *de minimis* (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute." *Id.* at 722.

Both German and Japanese Plaintiffs oppose the ITC's finding that the domestic industry is threatened with material injury by reason of subject imports. Respondents' Joint Mem. Support Mot. J. Agency R. ("Respondents' Brief") at 4.

Plaintiffs complain that although the ITC "claimed that it had 'considered, . . . all statutory factors that are relevant to these investigations,'" it never found that further imports were imminent, and never explained "why it was likely, or even possible, that material injury by reason of imports would occur *unless* an order was issued." *Id.* at 18 (emphasis in the original). The ITC responds that "the Commission was not required to incorporate in its determination language that simply tracked the statutory language, . . . ." Def. USITC Opp'n to Mot. J. Agency R. ("Defendant's Brief") at 35–36 (citing *Bando Chem. Indus., Ltd. v. United States,* 17 CIT 798, 803 (1993), *aff'd,* 26 F.3d 139 (Fed.Cir.1994); *Negev Phosphates, Ltd. v. United States,* 12 CIT 1074, 1083, 699 F.Supp. 938, 947 (1988)).

■ While the ITC is correct, in that this court has stated the ITC need not use the precise language of the statute in making its determination, the ITC's statements and analysis must be "sufficient for the Court to infer that the [Commission] found the threat to be real and imminent." *Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1036, 728 F.Supp. 730, 747 (1989).

The Court addresses the parties challenges according to the factors as considered by the Commission in making its determination.

### 1. *Capacity*

Threat factors II and VI both pertain to production capacity. In the underlying administrative proceeding, Plaintiffs argued that they were operating at nearly full capacity and therefore, "they could not make substantial additional sales to the United States." Respondents' Brief at 25 (citing Staff Report at VII–4 to VII–6).

The Commission rejected this argument, explaining, "although producers may be operating at high capacity utilization rates, they have demonstrated the ability to shift significant future production to the United States from other export markets in the future." Views at 51.

Plaintiffs challenge the Commission's decision, arguing, "[t]he ITC has not provided any cogent rationale why the plaintiffs would expand capacity and divert exports to the United States, . . . ." Respondents' Brief at 26. However, Plaintiffs mischaracterize the Commission's position. It is true that the Commission did not find that Plaintiffs *planned* to expand productive capacity or divert exports to the United States. However, it did not claim to have made such a finding. The Commission simply found that Plaintiffs have the ability to compete for and fill U.S. sales orders. *See* Views at 51 ("[A]lthough producers may be operating at high capacity utilization rates, they have demonstrated the ability to shift significant future production to the United States from other export markets in the future."). Therefore, the Commission concluded, Plaintiffs' high capacity utilization figures did not preclude a threat determination. *See id.* at 51–52 ("[T]he existence of high capacity utilization rates does not necessarily indicate an inability to increase shipments to the U.S. market. . . ."). The Commission never argued that Plaintiffs' capacity data constituted positive evidence that levels of subject imports would increase. The Commission treated Plaintiffs' capacity data as a neutral factor and appropriately attributed less weight to this data than to its other findings. *See* Views at 51 ("We place somewhat less reliance on capacity figures in these investigations. . . .").

■ Plaintiffs also argue, "the ITC took capacity and capacity utilization 'off the table' and presumed that plaintiffs could fill additional orders in the U.S. market despite their reported capacity limitations." Respondents' Brief at 26–27 n. 70. However, the Commis-

sion did not merely presume that Plaintiffs could fill additional orders, the Commission provided substantial evidence demonstrating that "producers are capable of quickly increasing capacity to satisfy new sales," Views at 51, and that "the capacity of the German and Japanese producers appears to vary in correlation with their production figures." *Id.* n. 239. These statements are supported by capacity data in the staff report showing that capacity for both German and Japanese Plaintiffs fluctuated widely during the period of investigation. *See* Staff Report at VII–4 to VII–6.

Based on these data, the Commission reasonably concluded that subject producers' reported capacity figures did not impose strict limits on their ability to increase production and sales. Thus, the ITC's determination that Plaintiffs' high capacity utilization rates did not preclude further imports was supported by substantial evidence.

### 2. *Home–Country and Third–Country Sales Opportunities*

In considering the statutory factor of "existing unused production capacity or imminent increase in production capacity," the ITC is required to take into account, "the availability of other export markets to absorb any additional exports...." 19 U.S.C. § 1677(7)(F)(i)(II).

Plaintiffs argue that, "the ITC never made any finding that the [Plaintiffs] lack sales opportunities outside the United States or that adverse market conditions outside the U.S. market will cause them to step up efforts in the United States." Respondents' Brief at 30. Furthermore, Plaintiffs claim to have "introduced unrebutted evidence that demand for LNPPs was increasing in Asia, Eastern Europe and Latin America. The ITC is subject to reversal if it ignores affirmative evidence that its predictions of increased imports are improbable or impossible." *Id.* at 31 (citing *Suramerica de Aleaciones Laminadas, C.A. v. United States,* 44 F.3d 978, 985 (Fed.Cir.1994)).

In support of their claim Plaintiffs cite MHI's Post–Hearing Brief, and TKS' Pre–Hearing Brief. Respondents' Brief at 31. However, as the Commission noted, the evidence in the MHI brief pertains to printing presses in general rather than to sales of LNPPs. Views at 52. The evidence in TKS' brief does show that the percentage of Japanese manufacturers' LNPP shipments going to the home market increased between 1994 and 1995 and were projected to increase further in 1996 and 1997. However, the 1995 increase did not increase the percentage of shipments going to the home market to the levels seen in the years 1991 through 1993. *See* TKS PreHearing Brief, List 2, Doc. 50 at 49–50 (citing Staff Report at VII–5, Table VII–2).

Because the data provided by Plaintiffs concerning third-country markets was not specific to LNPPs, the Commission's decision to attribute less weight to that data was reasonable. Furthermore, the table relied on by TKS, showing that home market shipments had increased in 1995, and were expected to increase further in 1996 and 1997, also shows that the percentage of shipments going to the United States will be higher in 1997 than in any year during the period of investigation and that the percentage of shipments going to third-country markets in 1997 will be lower than in any year during the period of investigation. *See* Staff Report at VII–6, Table VII–3. Thus, the Commission had substantial evidence to support its determination that the third-country and home-market data did not preclude a finding that exports to the United States could increase in the near future.

### 3. *Increased Imports and Market Penetration*

Regarding Factor III, Plaintiffs argue, "[t]he Act requires that the ITC shall consider, in making threat determinations, whether there has been a significant rate of increase of the volume or market penetration of imports of the subject merchandise *indicating the likelihood of substantially increased imports.*'" Respondents' Brief at 21 (emphasis in the original). "Although the ITC claimed to have found 'a significant increase' in the value of import sales in 1994 and 1995," Plaintiffs argue, "it could not have found that this increase was indicative of any similar increase in 1996, since its staff projected that the German and Japanese producers would

make no sales in that year,...." *Id.* Plaintiffs rely on the table appearing on page IV–14, "U.S. sales of domestic product, sales of imports by sources, and apparent U.S. consumption ..." to support this contention. *Id.* at 22 n. 56 (citing Staff Report at IV–14, Table IV–6).

Plaintiffs are correct. The table does show no sales by German or Japanese producers in 1996.[5] However, this by itself is not conclusive. There is other evidence on the record that tends to support the Commission's conclusion. The record shows that the volume and market penetration of subject imports increased significantly in 1994 and 1995.[6] Staff Report at IV–14, Table IV6. Furthermore, the Commission found that German and Japanese producers were competing with Goss on more than seventy-five percent of the sales that would be made in the twelve months following the final determination. Views at 50 n. 232. The evidence also demonstrates that in 1996, German producers submitted bids on approximately two thirds of the bids pending in the market as of August 1, 1996. *See* Staff Report at VII–7, Table VII–4. Similarly, the Japanese producers had submitted bids on approximately half of the sales pending as of August 1, 1996. *Id.* Thus here, the Commission's finding of a high number of pending contracts for which German and/or Japanese producers had submitted bids was supported by substantial evidence.

As the Commission explained, "[b]ecause the number and value of sales fluctuate considerably from year to year, changes in industry performance on a year-to-year basis may be of limited utility...." Views at 20. Thus, the Commission's decision to attribute less weight to the 1996 data was reasonable.

Plaintiffs also argue that because the *Washington Post* sale was the only sale of subject merchandise in 1995, the Commission's determination that subject imports are increasing was unjustified. "One sale does not make a 'trend,' and it was unreasonable for the ITC to make any predictions regarding future sales levels based on that one sale." Respondents' Brief at 23.

The Court agrees with Plaintiffs that one sale "does not make a 'trend,'" and that it would have been unreasonable for the ITC to base predictions of future import levels on one sale, even one as large as the *Washington Post* sale. However, the Commission's determination regarding the likelihood of increased future imports was not based solely on the 1995 sales data. In fact, as noted above, the Commission acknowledged that "changes in industry performance on a year-to-year basis may be of limited utility." Views at 20.

"The Commissioners have the discretion to determine the weight to be given factors they consider." *Metallverken Nederland,* 13 CIT at 1018, 728 F.Supp. at 735. The high number of pending contracts for which German and/or Japanese producers had submitted bids, together with the Commission's findings regarding the subject imports' increasing value and market share in 1994 and 1995, constitute substantial evidence that imports are likely to increase in the near future.

■ Finally, Plaintiffs argue that the Commission should not have included MHI's 1995 sale to the *Washington Post* in its analysis at all, because the Department of Commerce did not calculate a dumping margin for that sale. Respondents' Brief at 23.

"[I]t would be legally impermissible for the ITC to consider the *Washington Post* sale to

---

5. In its brief to this Court, the Commission also argues that Plaintiffs have mischaracterized the table's 1996 data. "These numbers are not projections made by the Commission 'staff' nor did the Commission characterize them as such.... [T]he table in question simply aggregates and reports interim 1996 sales data supplied by the domestic industry and the foreign producers...." Defendant's Brief at 43. However, whether the table represents projections or actual data, the fact is, the table indicates no sales of subject merchandise for at least part of 1996.

6. The record evidence shows that the value of contracts awarded to the subject imports increased from less than $5 million in 1993 to more than $85 million in 1994 and in 1995. Similarly, the market share held by subject imports increased from less than two percent in 1993 to more than thirty percent in 1994 and more than forty percent in 1995. Staff Report at IV–14, Table IV–6. However, the value and market share of imports also fluctuated in 1991–92. *Id.*

be a 'dumped import.'" *Id.* "[T]he Act requires the ITC to determine whether the domestic industry is materially injured or threatened with material injury 'by reason of imports, or sales (or the likelihood of sales) for importation, of *the merchandise* with respect to which the administering authority has made an affirmative determination....'" *Id.* at 26 (citing 19 U.S.C. § 1673d(b)(1)(B))(emphasis in the original). "[I]n the absence of a finding by [Commerce] that the merchandise sold to the *Washington Post* was sold at LTFV, the ITC was barred from considering the sale in its threat analysis." *Id.*

The relevant case law does not support Plaintiffs' argument here. In *Algoma Steel Corp. v. United States,* for example, plaintiff, a foreign producer, argued that the ITC had erred in assessing the volume of subject imports and their impact on injury, "by failing to take account of the fact that some sales ... were at fair value." 12 CIT 518, 518, 688 F.Supp. 639, 641 (1988), *aff'd,* 865 F.2d 240 (1989). In that case, plaintiffs argued that the ITC's actions violated the statutory requirement "that [the] ITC shall determine whether an industry in the United States is injured 'by reason of imports ... of the merchandise with respect to which the administering authority has made an affirmative determination....'" *Id.* at 522, 688 F.Supp. at 644 (citing 19 U.S.C. § 1673d(b) (1982 & Supp. IV 1986)).[7] The court responded that "Congress opted to direct [the] ITC to determine if imports of a specific class of merchandise, determined by [the] ITA [International Trade Administration] to have been sold at LTFV, are causing injury." *Id.* at 524, 688 F.Supp. at 645. "Thus," the court concluded, "the real question addressed to [the] ITC by the statute is what effect imports in a class of merchandise sold at LTFV have on the domestic industry producing the 'like' product." *Id.*

Plaintiffs argue that this case is unlike *Algoma Steel,* in that this case involves

made-to-order items rather than "'off-the-shelf' merchandise." Respondents' Brief at 25 n. 65. Plaintiffs cite *United Eng'g & Forging v. United States,* 15 CIT 561, 577, 779 F.Supp. 1375, 1389 (1991), *aff'd,* 996 F.2d 1236 (Fed.Cir.1993), for the proposition that "custom-built products may require more transaction-specific analysis." Respondents' Brief at 25 n. 65. However, *United Eng'g* does not support Plaintiffs' position. In *United Eng'g,* the plaintiff argued that "given the 'unusual market factors' in the ... industry," i.e. that the subject merchandise was made-to-order, the ITC should not have included in its analysis sales that were excluded from the ITA's investigation. *Id.* at 577–79, 779 F.Supp. at 1390–91. The court disagreed, stating, "[d]issimilar facts in Algoma, ... do not render its legal analysis inapposite. The ITC 'does not look behind ITA's determination, but accepts ITA's determination as to which merchandise is in the class of merchandise sold at LTFV.'" *Id.* at 579, 779 F.Supp. at 1391 (citing *Algoma Steel,* 12 CIT at 522, 688 F.Supp. at 644).

Similarly, in this case, although the ITA declined to calculate a dumping margin for the *Washington Post* sale, it did include the presses sold to the *Post* in the class of merchandise sold at less than fair value. *See Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Japan* 61 Fed.Reg. 8029, 8031–32 (Dep't Commerce 1996) (prel.det.)(explaining that the *Washington Post* sale was excluded from the margin analysis because it was "unbuilt, unshipped, and uninstalled," at the time of the investigation, and because there were two other sales available for analysis). Thus, the ITC appropriately considered the *Post* sale in its injury analysis.

### 4. *Price Effects of the Subject Merchandise*

With respect to the price effects of future imports, Plaintiffs argue that "the proposi-

---

7. The current dispute is governed by the 1994 version of the antidumping statute. However, the relevant language has not changed. *See* 19 U.S.C. § 1673d(b) (1994)("The Commission shall make a final determination of whether—(A) an industry in the United States—(i) is materially injured, or (ii) is threatened with material injury, ... by reason of imports, or sales ... of the merchandise with respect to which the administering authority has made an affirmative determination....").

tion that imports had suppressed or depressed prices was contrary to the findings of the ITC's staff." Respondents' Brief at 36. Specifically, Plaintiffs argue,

> [t]he Staff Report indicates that "given a particular specification and level of quality, the final installed price to the customer will be a significant deciding factor."... However, the Staff recognizes that non-price factors such as technology, quality, service and compatibility with existing presses are more important than price....

*Id.* at 35 n. 97 (citing Staff Report at V–6). Thus, Plaintiffs contend, "[t]he ITC Staff concluded only that price is determinative for a *hypothetical* sale, where technology, quality and other significant non-price factors are assumed to be the same for foreign and domestic bidders." *Id.* at 34–35 (citing Staff Report at V–6)(emphasis in the original). However, Plaintiffs read the ITC staff report too narrowly. In fact, the ITC Staff found that during the bid process, "the bids are expected to converge," so that by the time of the final bid, "the presses offered by the different makers generally are reasonably similar and meet specifications." Staff Report at V–7. This finding supports the Commission's determination that competition during the bid process plays a significant role in determining the sales price of the subject merchandise.

Plaintiffs also argue that a large fraction of the bids were non-competitive and in a significant number of the competitive bids, the bid was not awarded to the lowest bidder. Plaintiffs maintain "[b]oth of these phenomena are inconsistent with a finding that price is the predominant factor driving procurement decisions." Respondents' Brief at 35.

Again, Plaintiffs mischaracterize the Commission's findings. The Commission did not find that price was the *predominant* factor driving procurement decisions. In fact, the Commission stated, "[a]lthough price appears *not* to be the dominant factor in many bid situations, it is nevertheless often an important factor in the purchaser's decision at the

final stage of the bid process." Views at 41 (emphasis added)(footnotes omitted). Furthermore, the Commission reasonably determined that the fact that bids were not awarded to the lowest bidder in all cases did not necessarily preclude a finding of price suppression or depression by subject imports. As the Commission explained, "purchasers may seek to negotiate more expensive equipment or additional services at the same price level, thereby exacting a higher value product for what appears to be a price similar to that quoted by a different supplier." Views at 40.

■ In addition, the Court finds, the Commission's findings were supported by substantial evidence. According to the Commission, the "conventional approach to pricing analysis [was] not particularly useful in these investigations," due to, "the nature of the sales process and the relatively unique characteristics of each LNPP or addition sold," as well as, "the fact that price competition occurs primarily during the extensive and highly competitive bid/negotiation process for LNPP sales...." Views at 40. The Court agrees that because each LNPP is made to customer specifications, a more conventional approach, based, for example, on price trends over time,[8] would not have been useful. Thus, the Commission's decision to rely on anecdotal evidence in evaluating price effects of the subject merchandise was reasonable.

The ITC maintains that price is "often an important factor in the purchaser's decision at the final stage of the bid process." Views at 41. In support of this statement, "the Commission notes that in almost half of the bids involving competition between domestic and subject merchandise, the bid was awarded to the lowest bidder." *Id.* n. 202. The Court does not find this evidence, by itself, convincing. The majority of the presses sold were not sold to the lowest bidder. Furthermore, even in cases in which the lowest bid was chosen, purchasers appear to have based their final decisions on factors other than

---

8. *See e.g., Floral Trade Council v. United States,* 20 CIT —, 1996 WL 276957, *8 (1996) (upholding the ITC's determination that there was no evidence of price depression, where price of domestic merchandise decreased only slightly, despite the fact that subject import prices fluctuated downward during the period of investigation).

price. For example, one purchaser stated that it purchased a press from a foreign producer not because that producer offered the lowest price, but "because of its technology, configuration, and operating results." Staff Report at V–48 (citing Questionnaire submitted by the purchaser)(stating "if the price of both had been the same our production manager and press foreman would still have recommended the [imported] press.") *Id.* (quoting Questionnaire submitted by the purchaser, at 15). The newspaper did not indicate what it would have done if the imported press had been more expensive than the domestically produced press. Similarly, another purchaser stated that "after adjusting for rebates for used equipment and extra costs to be incurred by the newspaper in implementing the [press ultimately purchased]," the two final bids were "essentially equivalent." Staff Report at V–55. Thus, the purchaser explained, "[i]ntangible factors—particularly the perceived difference in the two bidders' enthusiasm for and commitment to the press project—ultimately persuaded it to purchase the presses from the [foreign producer]." *Id.* (citing Purchaser's Questionnaire response, July 20, 1995, att. at 2). Again, however, the purchaser did not say what it would have done if the foreign press had been significantly more expensive. Thus, the Court finds, this evidence is inconclusive regarding the importance of price in purchasers' choice of a vendor.

However, the staff report also includes two tables compiled from purchasers' questionnaire responses. One of these tables shows that eighteen of fifty purchasers surveyed said that price was among the top three most important factors in choosing which vendor to use. Staff Report at II–13. The second table shows that forty-four of forty-eight purchasers considered price to be either critical, very important, or moderately important. *See* Staff Report at II–14. These tables, in combination with the anecdotal evidence cited above, could reasonably lead to the conclusion that price is an important factor in

purchasers' choice of a vendor for an LNPP. *See National Ass'n of Mirror Mfrs. v. United States,* 12 CIT 771, 774, 696 F.Supp. 642, 644 (1988) ("It is within the Commission's discretion to make reasonable interpretations of the evidence....").

In support of its finding that subject imports suppressed or depressed prices, the Commission also stated that "purchasers use the prices of competing bids to negotiate lower prices with other bidders." Views at 42. Therefore, the Commission explained, "price competition from the subject imports can have significant adverse effects on domestic producers' prices, even when the domestic producers actually win the sale." *Id.* The ITC lists two sales as examples of contracts won by Goss, on which Goss claims to have lost revenues due to competition from subject imports.

In the first of the two sales, the ITC states that, "[the purchaser] indicates that prices fell during [the] bid process because of, among other things, degree of competition among producers...." Views at 42 n. 204. For the second sale, the purchaser acknowledged using "terms and conditions from [German and Japanese producers] to get the best deal from [Goss]." *Id.*

The ITC staff also found that, "[i]t is not uncommon for bidding firms to submit initial bids that are somewhat high. This leaves them room to negotiate, depending on the degree of competition in the bid process. It also assures that where competition is not keen the supplier does not 'leave money on the table.'" Staff Report at V–7. Thus, the evidence supports the ITC's contention that for some sales, the purchaser used competing bids to negotiate lower prices.

Finally, the ITC staff found that profit margins on sales of domestically produced LNPPs decreased in 1995, at the same time that the value and penetration of subject imports were increasing. *See* Staff Report at VI–9, Table VI–3; *see also* Staff Report at IV14, Table IV–6.[9] The Commission also had

9. However, there are other tables that appear to indicate that profit margins were still increasing in 1995, even while subject imports were increasing. *See* Staff Report at VI–3 to VI5, Tables V1–1 & V1–2; *see also* Staff Report at IV–14, Table

IV6. Table VI–3 does indicate that profit margins peaked in 1994, and then declined in 1995, when subject imports were increasing. *Id.* at VI–9, Table VI–3. At oral argument, government's counsel explained that Table VI–3 has greater

evidence suggesting that the impact of the subject imports on price would tend to intensify in the imminent future. Specifically, the Commission found that only a small number of sales were likely to be awarded in the imminent future.[10] "This small number of pending sales," the Commission explained, "will likely result in intense competition among domestic and foreign suppliers for bid awards. Moreover, this intensified competition for a smaller pool of sales opportunities increases the incentive for suppliers of LTFV imports to compete on the basis of price."[11] Views at 50.

Finally, Plaintiffs argue, the ITC's findings as to the price effects of future imports failed to consider the impact of competition among U.S. producers. Respondents' Brief at 35. "To the extent that this competition would have caused the same price effects in the absence of subject imports, it was improper for the ITC to claim that the price suppression or depression it allegedly observed had been caused by subject imports." *Id.*

"[A]bsent some showing to the contrary, the Commission is presumed to have considered all of the evidence in the record." *National Ass'n of Mirror Mfrs.*, 12 CIT at 779, 696 F.Supp. at 648. Furthermore, based on the evidence, the Commission could reasonably have concluded that competition among domestic producers alone could not have caused the price effects attributed by the ITC to the subject imports. Both the Plaintiffs and the Commission agree that price effects of competition, to the extent they exist, occur during the period of negotiation after producers have submitted their bids to the purchaser. According to Tables V–1 and V–2, in a significant number of the competitive contracts awarded during the period of investigation, Goss faced competition only

from foreign producers because no other domestic producers submitted bids. Staff Report at V–11 to V–14. Thus, any price effects caused by competition in these sales could not be the result of other domestic producers. Thus, the Commission could reasonably conclude that at least part of the price effect caused by competition would not have occurred in the absence of the subject merchandise.

There is competing evidence on the record that would tend to support Plaintiffs' view that subject imports did not cause depression or suppression of LNPP prices. For example, the evidence indicates that for many purchasers price is "a threshold factor that competing producers must meet for their initial bids to be competitive." Views at 41. The threshold is set, not by the bids offered by competitors, but by the purchaser's budgetary constraints. *See id.* ("Once the initial bids are submitted and meet the purchaser's budgetary constraints, and the bidding process continues, then the difference in prices tend to become a less important factor as compared to other factors such as technology and quality."). Thus, even in the absence of subject merchandise, domestic manufacturers would not be able to charge higher prices at this stage, because prices are limited by the purchaser's budget. *See Floral Trade Council*, 20 CIT ——, 1996 WL 276957, *8 (upholding finding that subject imports did not suppress domestic prices where the Commission found that domestic producers could not have raised prices even in the absence of LTFV imports).

Moreover, for many of the sales won by Goss in which Goss claims to have lost revenue, the purchasers do not support Goss's claims. *See, e.g.* Staff Report at V–33 to V–

---

reliability because it reflects sales in that year, while Tables VI–1 & VI–2 are based on the companies unadjusted books and records. Thus, Tables VI–1 & VI–2 do not reflect the lag time between sales and profits of LNPPs. In addition, the tables should be read in light of the fact that in 1994 a number of non-competitive bids were awarded to the domestic industry.

**10.** Plaintiffs dispute this finding, arguing that the Commission's method for determining the number of sales pending in the marketplace was

inadequate. For a discussion of the Commission's methodology see *infra* text pp. 34–40.

**11.** The Commission also notes that Goss "enjoys a significant competitive advantage because of its large installed base of LNPPs.... Given this factor," the Commission argued, "it can be expected that the subject producers will have an incentive to aggressively compete on price with the petitioner and other domestic producers in order to cut into that installed base." Views at 50–51.

34 (stating that the customer reports that it asked producers to lower their bids because their initial bids were not within its budget. Goss changed the specifications of the press it was offering in order to provide a press within the customer's budget.); *Id.* at v–35 to V–36 (noting that another customer reports that there was no competition on this sale); *Id.* at V–39 (stating that a third customer reports that there was no competition for this purchase. Only Goss was invited to bid because the paper was already using Goss printers and did not want to mix brands. The customer stated that Goss lowered its bid price during negotiations. Contrary to Goss's assertion, neither the purchaser nor the alleged foreign importer reported that the competitor had bid on this sale.); *Id.* at V–40 ("Although [Goss] claims lost revenue in this sale because of alleged competition from the alleged competitors, the customer did not support this assertion.").

Nevertheless, the totality of the evidence does not require a single conclusion. "It is not the Court's function to reweigh the evidence, but to decide whether the Commission's determinations are supported by substantial evidence." *Granges Metallverken,* 13 CIT at 474, 716 F.Supp. at 21. "[T]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* at 475, 716 F.Supp. at 21 (citing *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 619–20, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966)) (citation omitted). Here, the Court finds, substantial evidence supports the Commission's conclusion that the continued participation of producers of merchandise sold at less than fair value in the bidding process is likely to suppress or depress prices in the imminent future.

### 5. *Pending Sales*

In its final determination, the Commission stated that

[the] small number of pending sales, valued ... [at more than $125 million], will likely result in intense competition among domestic and foreign suppliers for bid awards. Moreover, this intensified competition for a smaller pool of sales opportuni-

ties increases the incentive for suppliers of LTFV imports to compete on the basis of price.... This smaller value of pending sales also makes it more likely that purchasers will continue to use the LTFV imports to extract price concessions from the domestic producers.

Views at 50.

Plaintiffs contest the Commission's finding that only a small number of LNPP contracts will be awarded in the near future. Plaintiffs maintain that the ITC's finding, as well as the conclusions the Commission draws from this finding, are not supported by substantial evidence. Respondent's Brief at 28.

The Commission found "the record shows that German and Japanese producers are now in direct competition with domestic producers for bids that are now pending in the LNPP market. While there is evidence of ... [fewer than twenty] currently pending sales of LNPPs and additions, there is a varying degree of likelihood that contracts will be awarded on these pending sales in the [then near] future." Views at 49. The Commission concluded that only one-third of these sales are likely to occur in the near future—the first half of 1997 or earlier. *Id.*

In determining which of these pending sales were "imminent," the Commission chose to rely on the expected sales dates reported in its questionnaire responses and confirmed by purchasers. *Id.* n. 231.

Plaintiffs challenge the validity of the Commission's process for identifying imminent purchases. Respondents' Brief at 28. Plaintiffs argue that the Commission based its finding on incomplete and unreliable data. *Id.* at 29. Plaintiffs also claim that the Commission did not pursue purchaser information on the status of a small number of pending additions sales on which petitioner was the sole bidder. *Id.* at 46.

▆ To the extent that Plaintiffs' argument rests on the theory that the ITC could have obtained more data, Plaintiffs' argument is irrelevant. The question is not whether the Commission might have obtained additional information, but whether the determination is supported by substantial

evidence on the record.[12] *Hannibal Indus., Inc. v. United States*, 13 CIT 202, 208, 710 F.Supp. 332, 337 (1989). "Congress set no minimum standard by which to measure the thoroughness of a Commission investigation." *Granges Metallverken*, 13 CIT at 481, 716 F.Supp. at 25.

The limits on the ITC's methodology are of a different character. As long as the methodology and procedures are a "reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Makita Corp. v. United States*, 21 CIT ——, ——, 974 F.Supp. 770, 787 (1997)(quoting *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404-05, 636 F.Supp. 961, 966 (1986), *aff'd*, 810 F.2d 1137 (Fed.Cir.1987)).

The Commission's determination here relied on information from producers, importers and purchasers. The Commission issued several questionnaires requesting data relating to sales pending in the market place.[13] Specifically, the Commission asked the domestic producers and the German and Japanese importers to report all LNPP bid solicitations that were then pending in the market place and requested them to submit detailed information describing the status of the bidding process for these bids.[14] Similarly, in its purchaser questionnaire, the Commission asked purchasers to report detailed bid information for sales that had been finalized during the period and for bids that were then pending.[15]

Subsequently, the Commission staff conducted an investigation to determine how many of the bids pending in the market were to be awarded imminently. As the basis for this investigation, the staff obtained information for the sales that the various producers had identified as being pending in the market. In the case of almost two-thirds of these bids, information was obtained directly from the purchasers as to the status and the imminence of the sale.[16] For almost half of these sales, the purchaser stated that the sale would be awarded before July 1997; for the other sales, the purchaser indicated that the sale was not imminent.[17] Furthermore,

---

**12.** Plaintiffs maintain that the Commission failed to conduct an adequate investigation of both quantity and future demand. Respondents' Brief at 41. Specifically, in challenging the Commission's investigation of pending bids, Plaintiffs rely on *Chung Ling Co. v. United States*, 16 CIT 843, 805 F.Supp. 56, (1992), and *Mitsubishi Elec. Corp. v. United States*, 12 CIT 1025, 700 F.Supp. 538 (1988), *aff'd*, 898 F.2d 1577 (1990). Respondents' Brief at 47. Plaintiffs' reliance on these cases is misplaced as they are inapposite.

In *Chung Ling*, the court found that the information gathered was "inadequate to furnish the Commission with any semblance of representative data in critical financial indicators of injury and causation." 16 CIT at 846, 805 F.Supp. at 61. Similarly, in *Mitsubishi Elec.*, the court decided that the Commission erred in not seeking data relevant to its inquiry. 12 CIT at 1059, 700 F.Supp. at 564. Here, the ITC followed its traditional practice of using data from producers and importers to measure quantity and future demand. *See e.g.*, *U.S. Steel Group v. United States*, 18 CIT 1190, 1218-19, 873 F.Supp. 673, 699 (1994), *aff'd*, 96 F.3d 1352 (Fed.Cir.1996). The Commission asked domestic producers and importers to report "all bids initiated before or since January 1, 1991, for large newspaper printing presses ..." in their initial questionnaire responses. Producer's Questionnaire, Section V.1, List 1, Doc. 205M, App. I-9. The producers and importers who filed questionnaire responses,

represent the vast majority of sales. *See* Staff Report at C-3, Table C-1 (showing that from 1991-95 imports from other sources were never more than five percent).

**13.** In fact, this approach was approved by counsel for Plaintiffs. In a May 1996 meeting with the Commission staff MHI's counsel stated as to future demand that this inquiry could be satisfied by asking "one or two questions of producers." List 1, Doc. 376.080B at 1 (Memorandum to File from Neal Reynolds Re: Meeting with Counsel for MHI, May 1, 1996).

**14.** *See e.g.*, List 2, Doc. 102.283xI, Section III-B.1 (Importer's Questionnaire: KBA Motter Corp., May 24, 1996)(requesting importers to report full bid details for all "bids initiated" after 1991; List 2, Doc. 102.266xP, Section IVB (Producer's Questionnaire: Rockwell Graphics Corporation, May 22, 1996)(same).

**15.** *See e.g.*, List 1, Doc. 205M at 3-8 (Purchaser's Questionnaire, April 17, 1996)(requesting detailed bid information on "firm's purchases or pending solicitations").

**16.** Staff Report at VII-8 to VII-14.

**17.** *Id.* Contrary to Plaintiffs' assertion that the ITC assumed "without evidence" that each of the

for ten of the sales, the staff obtained a detailed description of the status of the bid process and the nature of the bids offered from the purchaser.[18] For the remaining sales, the Commission staff did not obtain information on the status of the sale directly from the purchaser but was able to obtain and report detailed information on the status of the sales and competition on the sale from producer and importer questionnaires. Staff Report at VII–7, Table VII–4.

Based on this information, the Commission concluded that one-third of these pending sales were more likely to occur in the near future than other pending sales. Views at 49 n. 231.

Plaintiffs argue that the Commission's finding is contradicted by marketing data presented by them and the petitioner, showing a large number of orders, with a total value of more than $500 million to be awarded in the near future. Respondents' Brief at 28. Plaintiffs misunderstand the nature of the Commission's threat analysis.

The Commission is required to assess whether imports are imminent and material injury would occur in the absence of an order. Because it takes years to complete the bid process, the Commission appropriately concluded that only pending bids, particularly those in which an award was imminent, were relevant to its threat analysis.

 Furthermore, the Commission's decision to include among imminent sales only the pending sales that purchasers confirmed were imminent was reasonable. The Commission has the discretion to assess the probative nature of the evidence obtained in its investigation and to determine whether to discount the evidence or to rely on it. *General Motors Corp. v. United States*, 17 CIT 697, 703, 827 F.Supp. 774, 781 (1993). Here, the Commission declined to rely on producer estimates of sales dates when it could not obtain confirmations from the purchasers. *See e.g., U.S. Steel Group*, 18 CIT at 1217–18, 873 F.Supp. at 698–99 (affirming Commission's reliance on lost sales data for which only complete data was obtained).

 The Court finds that the Commission's findings regarding the small number of imminent sales, in combination with the Commission's price analysis evidence cited above, could reasonably lead to the conclusion that the presence of the LTFV imports in the bidding process will likely result in price suppression and depression. *See National Ass'n of Mirror Mfrs.*, 12 CIT at 774, 696 F.Supp. at 644 ("It is within the Commission's discretion to make reasonable interpretations of the evidence. . . .").

Plaintiffs are correct that the Commission staff did not pursue purchaser information on the status of the small number of pending additions sales on which petitioner was the sole bidder. However, this by itself is not conclusive. There is other evidence on the record that supports the Commission's conclusion that the subject producers would aggressively compete on other pending sales in the market. The Commission found that, of the imminent bids, the Japanese producers are directly competing with the domestic producers on more than seventy-five percent, which have an aggregate minimum Japanese bid value of more than $75 million. Views at 50 n. 232 (citing Staff Report at VII–7). The

other sales was not imminent, Respondents' Brief at 45, the record shows otherwise. *See id.* (July 26, 1996, telephone interview with Director of Production for one newspaper stating that "the newspaper was not currently in the market for new equipment" and that "it had no formal plans to purchase presses"); (July 29 and August 2, 1996 telephone interview with Executive Director of manufacturing and Development for another newspaper noting that "initial bids" had been made concerning three to four offset presses, but that he had "no idea" when and what will be decided upon); (July 26, 1996 telephone interview with Production Manager of a third newspaper explaining that "there was no pending purchase of LNPP's" by the paper); (July 26,

1996 telephone interview with Production Manager of a fourth newspaper stating that "his newspaper is family-owned and that they were in a position to wait 5 to 6 years in order to 'squirrel away' money to buy LNPPs"); and (July 26, 1996 response to written questions to the fifth newspaper explaining that the paper "was in the pre-RFP stage of LNPP considerations" but "that a final purchase decision date had not yet been determined.").

18. Staff Report at VII–3 & VII–7 to VII–14. For these sales, the Commission staff also obtained and reported information on the sales obtained from the producers and importers. *Id.*

German producers have submitted bids in competition with the domestic producers on more than seventy-five percent of the imminent sales, with an aggregate minimum German bid value of more than $80 million.

Thus, the Court finds the Commission's investigation was adequate to support its finding that the number of imminent sales was small, and that there is substantial evidence supporting the Commission's determination that, as a result, unfair imports would compete for those sales and may tend to suppress prices.

### 6. *Research and Development*

Plaintiffs argue that the Commission's findings with respect to the impact of subject imports on domestic producers' research and development (R & D) activities were not supported by the evidence. Respondents' Brief at 38. Specifically, Plaintiffs assert "[b]ased on the ITC's own findings, subject imports were present at what the ITC described as 'a significant level' throughout the POI.... Yet, that did not prevent Goss from spending a relatively constant amount annually on research and development, or from increasing its R & D spending in years that imports increased...." *Id.* at 37. Furthermore, Plaintiffs argue that the ITC's tables show that Goss's sales increased significantly from 1994 to 1995, while its R & D expenditures decreased during the same period. *Id.* at 38.

The Commission found, "there is a relatively direct correlation between a producer's research and development expenditures and its sales revenues." Views at 51. The Commission concluded, "the continued significant presence of the subject imports in the market will significantly hamper the industry's ability to develop the advanced technologies necessary to stay competitive in this market." *Id.* (footnotes omitted).

The Commission based its finding in part on the testimony of witnesses for the petitioner noting that the petitioner's ability to commit capital to R & D was directly linked to sales revenues. List 1, Doc. 285 at 62–65 (Transcript of Hearing, July 7, 1996). Consistent with this testimony, the other evidence before the Commission shows that annual expenditures on R & D fluctuated in the

same direction as annual sales revenues for 1991–95 each year during the period of investigation. *See* Staff Report at VI–4 to VI–5 & VI–23; *Cf.* Table VI–12 with Table VI–2.

Plaintiffs' arguments appear to ignore the data regarding the industry's R & D expenditures in 1991, which were more than double those in any other year of the period under investigation. *Id.* In light of the industry's R & D expenditures for 1991, it was reasonable for the Commission to conclude that there was a relatively direct correlation between a producer's R & D expenses and its sales revenues.

■ Furthermore, the Commission did not neglect the short-term data relied upon by the Plaintiffs. The Commission simply found that "changes in industry performance on a year-to-year basis" is of limited utility. Views at 20. The Commission relied on the correlation between long-term declines in revenue and research spending, and the inverse relationship of these trends with the long-term increase in import penetration. The Commission has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis. *Maine Potato Council v. United States*, 9 CIT 293, 300, 613 F.Supp. 1237, 1244 (1985).

Finally, Plaintiffs argue that the ITC's determination on this issue is based entirely on the assumption that subject imports will continue to enter the U.S. market and take sales from the U.S. industry. Plaintiffs maintain that there is no evidence to support this assumption. Respondents' Brief at 38.

However, as noted earlier, the Commission made specific findings regarding the value of the subject imports present in the domestic market during the period of investigation and the participation of subject producers in the bidding process for future sales indicating a likelihood of increased imports in the imminent future. *See supra* pp. ––––––. Accordingly, the Commission's analysis appropriately focused on an assessment of the future impact of the subject imports on the industry's R & D expenditures. Because the sales lost to subject imports began to affect the financials of the industry in 1996 and

1997, the Commission reasonably concluded that the industry's ability to commit money to R & D efforts would be adversely impacted.

### 7. *The Commission's Vulnerability Finding*

Plaintiffs argue that the Commission substituted a finding that the domestic industry was vulnerable for an analysis of the appropriate threat criteria. Respondents' Brief at 39, 43.

While the ITC did state that, "[i]n these investigations, the vulnerability of the domestic industry is an important factor in our consideration of the threat of material injury from subject imports," Views at 48, the Commission did not substitute its finding of vulnerability for consideration of the statutory criteria. As summarized above, the ITC considered each of the statutory criteria relevant to this proceeding.

Furthermore, the ITC's consideration of the current state of the domestic industry was appropriate and relevant to this proceeding. *Calabrian Corp. v. United States,* 16 CIT 342, 353, 794 F.Supp. 377, 387 (1992) ("Although the statute specifies certain factors that the Commission must consider in its threat analysis, the Commission may consider 'other relevant economic factors.' . . . The present relative health of an industry is an important indicator as to the imminence of material injury."); *see also Bando Chem.,* 17 CIT at 804, 1993 WL 327837 (1993) (affirming ITC finding of threat of material injury where the Commission first considered the vulnerability of the domestic industry). .

 Plaintiffs also argue that "[t]he ITC's '[f]inding' that Goss's [i]nstalled [b]ase in the United States [m]akes it *[m]ore* [v]ulnerable to [m]aterial [i]njury [d]efies [c]ommon [s]ense . . . ." Respondents' Brief at 32 (emphasis in the original). However, Plain-

tiffs misrepresent the Commission's findings. The Commission found that subject producers would have an incentive to compete aggressively on price with domestic producers, and particularly with Goss, due to Goss's "significant competitive advantage because of its large installed base of LNPPs, . . . ." Views at 50. The Commission did not find, as Plaintiffs maintain, that "Goss's competitive advantage from its installed base is a source of weakness that makes it *more* vulnerable rather than *less* vulnerable to injury . . . ." Respondents' Brief at 32 (emphasis in the original). The Commission stated only that Goss's advantage would lead subject importers to compete more aggressively in order to reduce that advantage. Thus, Goss's installed base was considered to be a factor in the Commission's analysis of price suppression, not in the Commission's vulnerability finding.

Finally, Plaintiffs argue, "the ITC cited absolutely no evidence for its conclusion that the industry's financial condition was likely to deteriorate quickly." Respondents' Brief at 39. Moreover, Plaintiffs argue, "neither the ITC's decision nor its staff report contain any *financial* analysis showing that imports from the countries under investigation would be the cause of the projected financial harm to the petitioner or the other U.S. producers." *Id.* (emphasis in the original).

However, the Commission based its finding in part, on the fact that the value of contracts awarded to the domestic industry and its share of the market in terms of sales awarded declined significantly during 1994 and 1995, primarily due to the competition from the subject imports.[19] This court has previously upheld a Commission's finding of loss of market as proof that subject imports contributed to rendering the domestic industry vulnerable. *See Mitsubishi Materials Corp. v. United States,* 20 CIT ——, ——, 918 F.Supp. 422, 426 (1996)(upholding Commis-

---

19. The Commission notes the record evidence shows that the value of contracts awarded to the domestic industry dropped from almost $250 million in 1993 to less than $170 million in 1994 and to less than $150 million in 1995, Views at 25 n. 129, while its market share declined from more than ninety-five percent in 1993 to less than sixty-five percent in 1994 and less than sixty

percent in 1995. *Id.* at 26, n. 131. Furthermore, based on the data in the record, the Commission projected that the value of contracts awarded to domestic producers would drop to between fourteen and fifteen million in full year 1996. *Id.* at 25 n. 129 (citing Staff Report at IV–14, Table IV–6).

sion's finding that "domestic producers were vulnerable to future imports because they had been deprived of the opportunity to expand capacity due to loss of market share in the Southern California market").

Plaintiffs concede that the financial consequences of any LNPP sale are spread out over the life of the contract delivery period. Respondents' Brief at 7 (citing Views at 23). Consequently, the full revenue impact of sales (or lost sales) will not show up in a producer's financial results for up to two or more years. Therefore, the Commission reasonably concluded that the adverse effects of the lost sales had not been fully reflected in the current financial condition of the industry, but that such effects would appear in the near future.

Furthermore, the Commission also noted that the domestic producers had projected a significant decline in order backlogs during the latter part of 1996. Views at 49. In addition, the petitioner had reported a gap in the production schedule for late 1996 and 1997, partly as a result of the decline in sales in 1996 and 1997. *Id.* Based on the whole record, the Court finds that the Commission's vulnerability analysis was supported by substantial evidence.

### 8. *The Impact of Possible Changes in the ITA's Dumping Margins*

Plaintiffs also argue that the magnitude of the dumping margins calculated by the ITA heavily influenced the ITC's determination. Plaintiffs have appealed the ITA's determinations in separate cases before this Court. Therefore, Plaintiffs maintain if the ITA changes the dumping margins announced for Plaintiffs as a result of appeal, "the Court should order the ITC to reconsider its determination to account for those changes, and to correct the other errors in its evaluation of

the dumping margins." Respondents' Brief at 54. To the extent that Plaintiffs' argument rests on the theory that a subsequent change in margins in and of itself provides an adequate basis for remand to the Commission, Plaintiffs' argument is flawed.

The antidumping statute directs the Commission to consider the "magnitude of the margin of dumping" in its injury analysis in any antidumping proceeding. 19 U.S.C. § 1677(7)(C)(iii)(V). Specifically, the statute defines the "magnitude of the margin of dumping" in a final injury determination as the margin "most recently published by [the ITA] prior to the closing of the Commission's official record." 19 U.S.C. § 1677(35)(C)(ii).

 The statute does not contemplate that a change in margins provides an automatic basis for remand to the Commission. In fact, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act recognizes that "[t]he finality of injury determinations would be seriously compromised if the Commission was required to amend or revisit its determination each time the administering authority modified its dumping margin." [20] H.R. Doc. No. 103–316, 103d Cong., 2d Sess. (1994) reprinted in Uruguay Round Agreements Act, Legislative History, Vol. VI, at 850 ("SAA"). Therefore, a subsequent change in margins does not automatically mandate a remand to the Commission by this Court.[21]

### B. Threat of Material Injury by Reason of LTFV Imports

 Due to the predictive nature of a threat of material injury determination, the ITC must use special care in making such a determination to avoid speculation or conjecture. *See id.* at 811. The ITC must make specific findings in support of its determina-

---

**20.** The Statement of Administrative Action represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements...." H.R. Doc. No. 103–316, at 656 (1994). "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." *Id.* (quoted in *Delverde, SrL v. United States*, 21 CIT ——, ——, 989 F.Supp. 218, 229–30 n. 18 (1997)).

**21.** Presumably, the Commission does retain the discretion to review a significant change in the margin and such a review may be subject to judicial review. In addition, if the margins change, Plaintiffs may be able to request a review by the Commission of its injury determination based on changed circumstances under section 1675(b). *See* 19 U.S.C. § 1675(b).

tion. *Matsushita Elec. Indus. Co., Ltd., v. United States,* 3 Fed. Cir. (T) 44, 51, 750 F.2d 927, 933 (Fed.Cir.1984) (citations omitted); *see* 19 U.S.C. § 1677(7)(F)(ii) ("a determination [of a threat of material injury] may not be made on the basis of mere conjecture or supposition."). The Commission's findings must establish that the threat is imminent and caused by the subject imports. 19 U.S.C. § 1677(7)(F)(ii). "Evidence of *de minimis* (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute." *Gerald Metals,* 132 F.3d at 720.

Plaintiffs argue the Commissions finding of a threat of material injury was unlawful. "At most the ITC's decision identified a possibility of future harm that would have existed whether or not an antidumping duty order was issued, simply as a result of past sales that would not have been affected by the issuance of antidumping orders." Respondents' Brief at 18. Therefore, Plaintiffs claim that the ITC failed to make the determinations required by the antidumping statute in order to find a threat of material injury.

At oral argument, Plaintiffs maintained that the two-year delay in the financial effect of increased subject imports on the domestic industry, necessarily prevents the Commission from finding that a threat of material injury is imminent. In addition, counsel argued that the effects of past LTFV imports cannot legally form the basis for the determination that a threat of injury exists because such a finding requires a determination that the threat is from imports which will occur unless an order is issued. *See* 19 U.S.C. § 1677(7)(F)(ii).

Government's counsel however, noted that the statute specifically provides for a determination of material injury by reason of "sales for importation." *See* 19 U.S.C. § 1677(7)(F)(i). It is precisely the lost sales experienced in 1994 and 1995, the Government argued, that subsequently rendered the domestic industry vulnerable. The vulnerability of the industry in combination with the adverse trends of increased subject imports and the small number of pending sales created the threat of material injury.

The Court cannot accept Plaintiffs' reading of the statute. Here, after assessing all the relevant economic factors, the ITC completed a thorough analysis of the whole record. On this basis, the Commission reasonably concluded that the industry in the United States producing LNPP's is threatened with material injury by reason of imports from Germany and Japan that are sold at less than fair value.

The Commission evaluated all the relevant statutory threat factors as well as some non-statutory economic factors. With respect to capacity, the Commission determined that although the subject producers' capacity utilization was high throughout the investigation period, that finding did not preclude a conclusion that further subject imports were imminent. The Commission also made specific findings regarding the value of subject imports present in the market during the period of investigation and the participation of subject producers in the bidding process for future sales, indicating a likelihood of increased imports in the imminent future.

With respect to the price effects of the subject merchandise, the Commission provided substantial evidence to support its conclusion that the participation of subject producers in the bidding process would tend to suppress or depress LNPP prices in the imminent future. The Commission also provided substantial evidence to support its conclusion that continued import competition will significantly hamper the industry's ability to develop the advanced technologies necessary to stay competitive in the market.

With respect to the vulnerability of the domestic industry, the Commission made specific findings regarding the decline in the industry's market share in 1994–95 that might not show up in the producer's financial results for two or more years,[22] the decline in domestic producer's projected order backlogs during the latter part of 1996, and the petitioner's reported gap in the 1996–97 production schedule.

---

**22.** *See* discussion *supra* pp. 1101–02.

The Commission also rendered an analytically distinct determination that LTFV imports themselves are causing a threat of material injury to the domestic industry. The Commission found that past LTFV imports had rendered the domestic industry vulnerable to future subject imports. An increase in these imports was imminent, which in turn, threatened material injury to the domestic industry because of their price-suppressing effects.

Although Plaintiffs are correct that some of the record evidence could lead to different conclusions, the ITC has the discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis. *Maine Potato Council,* 9 CIT at 300, 613 F.Supp. at 1244. In this regard, "the court may not reweigh the evidence or substitute its judgment for that of the ITC." *Dastech Int'l Inc. v. United States,* 21 CIT ——, ——, 963 F.Supp. 1220, 1222 (1997); *Timken Co. v. United States,* 12 CIT 955, 962, 699 F.Supp. 300, 306 (1988); *aff'd,* 8 Fed. Cir. (T) 36, 894 F.2d 385 (Fed.Cir.1990). Accordingly, the Commission's determination is supported by substantial evidence and is otherwise in accordance with law.

### Conclusion

For the foregoing reasons, the ITC's final determination in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany and Japan,* Inv. Nos. 731–TA736 & 737, USITC Pub. No. 2988 (Aug.1996)(final det.) is sustained.

### JUDGMENT

This case having been submitted for decision and the Court, after due deliberation, having rendered a decision herein; in conformity with said decision, it is hereby

**ORDERED** that Plaintiffs' motion for judgment upon the agency record is denied in all respects; and it is further

**ORDERED** that the U.S. International Trade Commission's final determination in *Large Newspaper Printing Presses and Components Thereof, Whether Assembled or Unassembled, From Germany and Japan,*

Inv. Nos. 731–TA–736 & 737, USITC Pub. No. 2988 (Aug.1996) is sustained; and it is further

**ORDERED** that this case is dismissed.