**Slip Op. 99-136**

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr>
<td>

NEC CORPORATION and
HNSX SUPERCOMPUTERS, INC.,

    and

FUJITSU LIMITED and
FUJITSU AMERICA, INC.

        Plaintiffs,

    v.

DEPARTMENT OF COMMERCE and
U.S. INTERNATIONAL TRADE
COMMISSION

        Defendants,


CRAY RESEARCH, INC.,

        Defendant-Intervenor.

</td>
<td>

BEFORE: Pogue, Judge

Court No. 97-11-01967

</td>
</tr>
</table>

[ I T C    R e m a n d

D e t e r m i n a t i o n

Affirmed]

Decided: December 17, 1999

Paul, Weiss, Rifkind, Wharton, & Garrison (Robert E. Montgomery, Jr., Terence J. Fortune, David J. Weiler) for Plaintiffs NEC Corporation and HNSX Supercomputers, Inc.

Akin, Gump, Strauss, Hauer & Feld, L.L.P. (Warren E. Connelly, Steven G. Johnston) for Plaintiffs Fujitsu Limited and Fujitsu America, Inc.

Lyn M. Schlitt, General Counsel; James A. Toupin, Deputy General Counsel; Cynthia P. Johnson, Attorney, Office of General Counsel, U.S. International Trade Commission, Counsel for Defendants Department of Commerce and U.S. International Trade Commission.

Wilmer, Cutler & Pickering (John D. Greenwald, Deirdre Maloney) for Defendant-Intervenor Cray Research, Inc.

**OPINION**

**Pogue, Judge:**  On December 15, 1998, the Court remanded this matter to the International Trade Commission ("Commission").  NEC Corp. v. DOC, 22 CIT __, 36 F. Supp. 2d 380 (1998) ("NEC I").  In particular, the Court ordered the Commission to reconsider its threat determination in order to further explain how the subject less-than-fair-value ("LTFV") imports themselves make a material contribution to the threatened material injury.  NEC I, 22 CIT at __, 36 F. Supp. 2d at 394.

**Background**

On July 29, 1996, Cray Research, Inc. ("Cray"), filed a petition with the Department of Commerce ("Commerce") alleging that vector supercomputers from Japan are being, or are likely to be sold in the United States at LTFV, and that such imports are materially injuring, or threatening material injury to an industry in the United States.  See Vector Supercomputers from Japan, 61 Fed. Reg. 43,527 (Dep't Commerce 1996) (initiation antidumping duty investig.).

Commerce published a preliminary determination, <u>Vector Supercomputers from Japan</u>, 62 Fed. Reg. 16,544 (Dep't Commerce 1997)(prelim. determination), and a final determination, <u>Vector Supercomputers from Japan</u>, 62 Fed. Reg. 45,623 (Dep't Commerce 1997)(final determination), concluding that Japanese vector supercomputers were being sold at LTFV in the United States.

On October 9, 1997, the Commission promulgated its final injury determination, concluding that the domestic industry is threatened with material injury by reason of LTFV imports of Japanese vector supercomputers. <u>Vector Supercomputers from Japan</u>, Inv. No. 731-TA-750 (Final) (List No. 1, Doc. 223) (October 9, 1997); <u>reprinted in</u> 62 Fed. Reg. 53,801 (Int'l Trade Commission 1997) ("Final Determination").[1] The Commission, however, found no present material injury. <u>Id.</u> at 36.

Commerce published an antidumping order covering the subject merchandise on October 24, 1997. <u>Vector Supercomputers from Japan</u>, 62 Fed. Reg. 55,392 (Dep't Commerce 1997) (notice antidumping duty order). The margin found for Fujitsu was 173.08%. The margin found for NEC was 454%. <u>Id.</u> at 55,393.

---

[1]List 1 consists of documents within the public portion of the record made before the Commission. List 2 consists of the documents within the confidential portion of the same record. List 3 consists of the documents within the privileged portion of the same record.
    Reference is also made to <u>Vector Supercomputers from Japan</u>, Inv. No. 731-TA-750 (Final) (Remand). Remand Record List 1R consists of the documents within the public portion of the record made before the Commission. Remand Record List 2R consists of the documents within the confidential portion of the same record. Remand Record List 3R consists of the documents within the privileged portion of the same record.

The Commission's Final Determination was appealed to this Court by Fujitsu Limited and Fujitsu America, Inc. (collectively "Fujitsu"), and NEC Corporation and HNSX Supercomputers Inc. (collectively "NEC"). Ruling on the consolidated action of Fujitsu and NEC (collectively "Plaintiffs"), this Court sustained in part and remanded in part. The Court sustained the Commission's finding that vector supercomputers are a separate like product, see NEC I, 22 CIT at __, 36 F. Supp. 2d at 390, but remanded for further explanation or reconsideration the Commission's finding that the domestic industry is threatened with material injury by reason of LTFV imports of vector supercomputers from Japan. See id. at __, 36 F. Supp. 2d at 394.

The Commission issued a remand determination in Vector Supercomputers from Japan, Inv. No. 731-TA-750 (Final)(Remand) (Remand List No. 2R, Doc. 181)(March 16, 1999)("Remand Determination"). The Court now reviews the Commission's Remand Determination.[2]

---

[2]Three Commissioners, Chairman Bragg, Vice Chairman Miller, and Commissioner Koplan, found affirmatively on remand. Chairman Bragg submitted separate views. Commissioner Askey found negatively on remand.

## Standard of Review

The court will uphold a determination by the Commission unless it is not supported by substantial evidence in the administrative record or is otherwise not in accordance with the law. See Section 516a(b)(1)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

## Discussion

**1. On remand, did the Commission reconsider its threat of material injury finding in a way consistent with the requirement that the LTFV imports themselves must have made a material contribution to the threatened material injury?**

The Court of Appeals for the Federal Circuit has articulated the following legal standard regarding present material injury determinations: "An affirmative injury determination requires both (1) present material injury and (2) a finding that the material injury is 'by reason of' the subject imports." Gerald Metals, Inc. v. United States, 21 CIT __, __, 132 F.3d 716, 719 (Fed. Cir. 1997) ("Gerald Metals I"). This Court has held that "the 'by reason of' standard also applies to threat determinations." Gerald Metals, Inc. v. United States, 22 CIT __, __, 27 F. Supp. 2d 1351, 1365 n.17 (1998) ("Gerald Metals II"). In NEC I, this Court explained that to make a threat determination, "the statute requires adequate evidence to show that the [threat of] harm will occur by reason of the LTFV imports, not by reason of a minimal or tangential

contribution to material harm caused by the LTFV goods."  22 CIT at
__, 36 F. Supp. 2d at 391; see also 19 U.S.C. 1677(7)(A) (1994)
("The term 'material injury' means harm which is not
inconsequential, immaterial or unimportant."); 19 U.S.C.
1677(7)(F)(ii) ("[A] [threat] determination may not be made on the
basis of mere conjecture or supposition.").  In sum, the standard
requires "'a causal—not merely temporal—connection between the LTFV
goods and the [threat of] material injury.'"  Id. (quoting Gerald
Metals, 132 F.3d at 720)(brackets in original).

    In its Remand Determination, the Commission appears to have
understood the applicable legal standard: "the Commission may not
analyze subject imports in a vacuum.  Instead, we fully consider
other significant economic factors in determining that subject
imports themselves contribute in a more than de minimis way to
material injury or threat."  Remand Determination at 5.  The Court
had criticized the Commission in NEC I for its failure to
"undertake any analysis to distinguish between the contribution to
material harm caused by LTFV goods and these economic factors
unrelated to the subject imports."  22 CIT at __, 36 F. Supp. 2d at
392.  In its Remand Determination, the Commission attempts to
explain more fully than it did in its Final Determination how,
after considering the effects of "other factors," the Commission is
able to conclude that the subject imports themselves pose a threat
of material injury.[3]

---

    [3]Three "other factors" have been identified by the parties:
the decline in recent years in government spending on vector

In its Final Determination, the Commission found a threat of material injury. See Final Determination at 38. However, the Commission found no present material injury on the ground that the "other factors," and not the subject imports from Japan, had caused whatever present material injury the domestic industry had suffered. See Final Determination at 36. In its Remand Determination, the Commission again found a threat of material injury, and explained its determination by demonstrating that the "other factors" will decline in significance in the future. See Remand Determination at 9-11. Thus, although the "other factors" will continue to affect the condition of the domestic industry, they will not have such an overwhelming effect as to prevent a finding of threat of material injury. See Remand Determination at 13.

Separately, the Commission conducted a "vulnerability analysis," and determined that the "other factors" had weakened the financial condition of the domestic industry, thus rendering it vulnerable to injury by reason of subject imports. See Remand Determination at 11-12. The Commission then considered the statutory factors—including the "other factors"—in the context of a vulnerable domestic industry, and determined that subject imports themselves make a material contribution to the threat of material injury. See Remand Determination at 12.

---

supercomputers; the rise in the number of vector applications that may be performed by non-vector supercomputers; and the financial restructuring Cray undertook in the mid-1990's.

Plaintiff NEC contends that this approach fails to meet the "by reason of" standard. NEC rejects the "vulnerability analysis" used by the Commission on the basis that it "effectively cumulates the impact of imports with non-import factors, when the statute requires just the opposite: that the Commission distinguish between imports and non-import factors." Cmts. of NEC on the Commission's Remand Determination ("NEC Remand Cmts.") at 5-6.

The Court disagrees. In a threat determination, "vulnerability analysis" is appropriate and relevant to consider as "among other relevant economic factors."[4] U.S.C. § 1677(7)(F)(i) (1994). Underlying vulnerability analysis is the principle that

_____

[4]See, e.g., Calabrian Corp. v. United States Int'l Trade Comm'n, 16 CIT 342, 353, 794 F. Supp. 377, 387 (1992)("The present relative health of an industry is an important indicator as to the imminence of material injury."); Bando Chem. Indus. v. United States, 17 CIT 798, 803-04 (1993), aff'd 26 F.3d 139 (Fed. Cir. 1994)(approving use of "vulnerability analysis" in threat determination); Goss Graphics Sys., Inc. v. United States, 22 CIT __, __, 33 F. Supp. 2d 1082, 1101 (1998), appeals docketed, Nos. 99-1150, 99-1151, 99-1152 (Fed. Cir. 1999)("ITC's consideration of the current state of the domestic industry was appropriate and relevant to this proceeding."). The Statement of Administrative Action to the Uruguay Round Agreements Act describes vulnerability analysis in mandatory terms: "In threat determinations, the Commission must carefully assess current trends and competitive conditions in the marketplace to determine the probable future impact of imports on the domestic industry and whether the industry is vulnerable to future harm." Statement of Administrative Action, H.R. Doc. No. 103-316 (1994), reprinted in 6 Uruguay Round Agreements Act, Legislative History, at 885 ("SAA").
  The SAA represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements . . . ." SAA at 656. "[I]t is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in this Statement." Id. (quoted in Delverde, SrL v. United States, 21 CIT __, __, 989 F. Supp. 218, 229-30 n.18 (1997)).

the foreign industry must "take the domestic industry as [it] finds it."  <u>Hosiden Corp. v. Advanced Display Mfrs. of Am.</u>, 85 F.3d 1561, 1569 (Fed. Cir. 1996) (quoting <u>Iwatsu Elec. Co. v. United States</u>, 15 CIT 44, 57, 758 F. Supp. 1506, 1518 (1991)). In <u>Goss Graphics</u>, the Court endorsed the use of "vulnerability analysis," so long as "the Commission did not substitute its finding of vulnerability for consideration of the statutory criteria."[5]  <u>Goss Graphics</u>, 22 CIT at __, 33 F. Supp. 2d at 1101.  Accordingly, an affirmative threat determination based solely on a finding of vulnerability coupled with the presence of statutory factors would be the kind of temporal connection disapproved of in <u>Gerald Metals</u>.  Yet the "by reason of" standard is met if the Commission can articulate a causal connection between the threat of injury to the domestic industry and the subject imports themselves, while avoiding attributing the threat from non-import factors to threat from subject imports.  See <u>Goss Graphics</u>, 22 CIT at __, 33 F. Supp. 2d at 1103 (affirming the Commission's conclusion that, "[t]he vulnerability of the industry in combination with the adverse trends of increased subject imports and the small number of pending sales created the threat of material injury.").

---

[5]<u>See also</u> <u>Calabrian Corp.</u>, 16 CIT at 354, 794 F. Supp. at 388 (recognizing that vulnerability analysis "only establishes the background against which the Commission considers the likely effect of future imports, based on consideration of the factors set forth in the statute"); <u>Suramerica De Aleaciones Laminadas, C.A. v. United States</u>, 44 F.3d 978, 983 (Fed. Cir. 1994)(holding that the Commission must examine all "factors that tend 'to make the existence of a [threat of material injury] more probable or less probable[.]'")(citing Fed. R. Evid. 401, 19 C.F.R. § 210.42(b) (1994))(brackets in original).

Here, the Commission acted properly.  Its analysis indicates that the Commission appreciated the distinction between "cumulating" and "distinguishing."  The Commission considered how "other factors" had made the domestic industry vulnerable, not just to the general impact of market forces, but to the specific impact of the subject imports.  Further, the Commission considered to what degree "other factors" contributed to the threat of material injury separate from, not in addition to, the contribution of the subject imports.   The Commission concluded that (1) "other factors" are not the overwhelming cause of the threat of material injury; (2) "other factors" had, however, rendered the domestic industry vulnerable to the threat of subject imports; and (3) subject imports themselves pose a material threat to this vulnerable domestic industry, notwithstanding the ongoing contribution of "other factors."  Thus, the Commission effectively distinguished the impact of non-import factors from the impact of import factors.[6]

Plaintiff Fujitsu opposes the Commission's analysis by arguing

---

[6]"Weighing," in the sense of determining whether the impact of any one factor is more or less significant than the impact of any other, is not required.  The requirement is one of non-attribution, as explained in Taiwan Semiconductor Indus. Ass'n v. United States, 23 CIT __, 59 F. Supp. 2d 1324, 1331 (1999): "Where other sources of injury are known, the Commission must conduct some examination to ensure that it does not attribute the harmful effects from the other factors to the subject imports." Fujitsu accurately stated in its Remand Cmts. that, "one form of 'weighing' is absolutely required, and that is the weighing by which the Commission must determine whether imports 'themselves' threaten to cause material injury or whether they threaten to have only a de minimis or tangential effect." Fujitsu's Cmts. on the ITC's Remand Determination ("Fujitsu Remand Cmts.") at 5-6.

that, "as a matter of law, the Commission could not make an affirmative threat finding on remand without first considering the impact which the relevant 'conditions of competition,' which the Commission refers to as 'vulnerability factors,' would have on Japanese imports." Fujitsu Remand Cmts. at 2. Buy American restrictions, the prevalence of sole source procurements favoring the domestic industry, the decline in government funding for projects for which Japanese imports compete, and the increased substitution of non-vector for vector systems "make it extremely unlikely, if not impossible, for Japanese producers to increase their U.S. sales volumes or market share . . . ." Fujitsu Remand Cmts. at 27.

The Court disagrees with Fujitsu that the Commission's analysis necessarily failed to meet the required legal standard. The Commission considered the evidence referenced by Fujitsu, but reached the opposite conclusion as to their effects on Japanese importers. See discussion infra, Part 2. Fujitsu drew its conclusion from the same evidence, while pointing to other evidence on the record favorable to foreign producers. Nonetheless, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Com., 383 U.S. 607, 620 (1966); see also Goss Graphics, 22 CIT at __, 33 F. Supp. 2d at 1104 ("Although Plaintiffs are correct that some of the record evidence could lead to different conclusions, the ITC has the discretion to make reasonable

interpretations of the evidence and to determine the overall significance of any particular factor in its analysis.").

The Commission's approach demonstrates that the Commission understood and applied the Court's instruction on remand to "ma[k]e the requisite determination that the LTFV imports themselves made a material contribution to the threatened material injury." NEC I, 22 CIT at __, 36 F. Supp. 2d at 394.  Therefore, if the various aspects of the Commission's analysis are supported by substantial evidence, and the Remand Determination is otherwise in accordance with the law, the Commission will have complied with the Court's Remand Order.

**2.   Is the Commission's determination that the domestic industry is threatened with material injury supported by substantial evidence and otherwise in accordance with law?**

The statute governing threat determinations requires the Commission to consider, "among other relevant economic factors," nine enumerated factors.  Four factors are relevant to this case:[7]

> (II) any existing unused production capacity or imminent, substantial increase in production capacity in the exporting country indicating the likelihood of substantially increased imports of the subject merchandise into the United States, taking into account the availability of other export markets to absorb any additional exports, (III) a significant rate of increase of the volume or market penetration of imports of the subject

---

[7]Inventories and product shifting (factors V and VI) are not relevant to this investigation.  Remand Determination at 8. Also, neither a countervailable subsidy (factor I) nor a raw agricultural product (factor VII) is involved.

> merchandise    indicating    the    likelihood    of
> substantially increased imports,
> (IV) whether imports of the subject merchandise are
> entering at prices that are likely to have a
> significant depressing or suppressing effect on
> domestic prices, and are likely to increase demand
> for further imports,
> ....
> (VIII) the actual and potential negative effects on
> the existing development and production efforts of
> the domestic industry, including efforts to develop
> a derivative or more advanced version of the
> domestic like product[.]

19 U.S.C. § 1677(7)(F)(i)(1994).

Below, the Court reviews Commission's analysis regarding each of the relevant factors, including "other factors," to determine whether substantial evidence supports its findings, and whether that analysis was conducted in a manner consistent with the legal standard articulated above and otherwise in accordance with law.[8]

---

[8]Plaintiffs are correct in pointing out that, in the "price effects" analysis contained in the Remand Determination, the Commission "mistakes the Court's use of an example showing how the Commission omitted the required analytically distinct determination of material cause for a complete statement of the errors which it made." Fujitsu Remand Cmts. at 4. In NEC I, the Court found the Commission's analysis of one of the statutory factors—the price effects of future imports—to be lacking in a way that exemplified the legal error committed in the Final Determination: "[T]he Court is nothing [sic] that neither the Commission's finding overall, nor its analysis of the individual statutory threat factors, indicate that it applied the analysis mandated by the Federal Circuit." 22 CIT at __, 36 F. Supp. 2d at 393 n.9 (emphasis added). On remand, the Commission was required to analyze all relevant statutory factors in a manner consistent with the legal standard set out above. The Commission consequently appears to have misinterpreted the Remand Order by analyzing separately the price effects factor. See Remand Determination at 1. Nonetheless, the mistake need not be fatal, if the Commission successfully addressed all relevant statutory factors in other sections of the Remand Determination.

### a.    Volume and Capacity

The Commission found that subject import volumes and market share increased significantly during 1996 and interim 1997, citing the number of imported systems viewed absolutely and relative to the number of domestic systems shipped, and the value and computing power of those systems.[9]  The Commission also considered evidence of the cancellation or postponement of several sales to Japanese producers due to the pendency of its investigation.  Based on this evidence, the Commission concluded that subject imports will likely continue to enter the U.S. market at an increased volume.  See Remand Determination at 7; Final Determination at 40-41.

The Commission also explained how this increase in volume threatens material injury to the domestic industry.  First, because of the small size of the vector supercomputer market in terms of numbers of systems sold, and the high purchase price of each system, the Commission concluded that the loss of even one sale has

---

[9]Remand Determination at 6-7; Vector Supercomputers from Japan, Inv. No. 731-TA-750 (Final)(List 2, Doc. 35)(Sept. 16, 1997)("Final Staff Report") at IV-5 (Table IV-2), IV-6 (Table IV-3).  Plaintiffs contend that the Commission should not have included "internally transferred machines" in its computation of the number of systems imported.  See NEC Remand Cmts. at 26-27; Fujitsu Remand Cmts. at 8-10.  The Commission, however, considered this evidence and decided not to credit respondents' assertion that these machines were restricted to internal use (see Final Determination at 41 n.133); furthermore, the Commission has "discretion to make reasonable interpretations of the evidence and to determine the overall significance of any particular factor in its analysis."  Goss Graphics, 22 CIT at __, 33 F. Supp. 2d at 1104; accord Maine Potato Council v. United States, 9 CIT 293, 300, 613 F. Supp. 1237, 1244 (1985).

a significant impact on the producer.  See Remand Determination at 12 (citing Final Staff Report at I-22, VI-2 (Table VI)).  Second, Japanese producers have succeeded recently in making inroads into the high end of the market, where profit margins are the greatest.[10] Remand Determination at 7; Final Determination at 43 (citing Final Staff Report at V-6 through V-7 (Table V-1), VI-3). The Commission concluded that an increase in subject imports, aimed in part at the high end of the market, combined with aggressive pricing, see discussion infra Part 2.b, threatens the domestic industry with material injury.  See Remand Determination at 12.

The Commission also found that Japanese producers' capacity increased during the period of investigation, and that capacity will increase in the future.  See Remand Determination at 8; Final Determination at 38 (citing Final Staff Report at VII-7 (Table VII-1), VII-8 (Table VII-2)).  The Commission pointed to evidence that, in the supercomputer industry, capacity levels are set by the decision to produce a certain number of products, rather than material or other production constraints.  See Remand Determination at 8; Final Determination at 38-39 (citing Final Staff Report at VII-4).  Therefore, the Commission found that a decision by Japanese producers to substantially increase imports into the United States is feasible in terms of capacity.  See Remand

---

[10]The most important of these transactions was the proposed sale of an NEC vector supercomputer to the University Corporation for Atmospheric Research ("UCAR").  This high-value contract was canceled, however, due to the Commission's investigation.  See Remand Determination at 18-19.

Determination at 8; Final Determination at 39.  In addition, the
Commission cited trend evidence indicating that, as a percentage of
total systems shipped, exports to both the Japanese market and
other export markets will decline, while imports to the United
States will increase in the future.[11]  See Remand Determination at
8; Final Determination at 39 (citing Final Staff Report at VII-7
(Table VII-1)).  Considering all the evidence, we conclude that the
Commission's findings are supported by substantial evidence and
otherwise in accordance with the law.

Plaintiff Fujitsu argues that the Commission has failed to
prove, in an "analytically distinct step," that increased import
volumes would "by themselves" threaten material injury.  See
Fujitsu Remand Cmts. at 6.  The Court does not agree that the
Commission is required to take such a step with respect to each
individual statutory factor.  The key to the "by reason of" test is

---

[11]Plaintiff Fujitsu argues that there is insubstantial
evidence to support the conclusion that increased imports to the
United States will continue in the future.  The cancellation of
the UCAR transaction has apparently made government buyers wary
of purchasing from Japanese producers.  Fujitsu Remand Cmts. at
16-17.  The Commission, however, found more persuasive evidence
of four potential sales of NEC vector supercomputers, three to
commercial buyers and one to a government entity, and four
potential sales of HNSX products, all to commercial buyers.
Though some of these sales were canceled due to the pendency of
the antidumping investigation, this evidence demonstrates that,
even if the domestic industry had a monopoly over government
sales, a significant commercial market exists for Japanese
exports.  See Final Determination at 41-42 & n.134; Final Staff
Report at V-7 (Table V-1), V-10 (Table V-2), V-16 (Table V-5), V-
19 (Table V-6); Vector Supercomputers from Japan, Inv. No. 731-
TA-750 (Final)(List 2, Doc. 21)(Aug. 21, 1997) ("Cray Pre-Hearing
Brief") at Annexes E, F.  The Court finds that Plaintiffs have
failed to show that the Commission's evidence is insubstantial.

a showing that "these factors <u>as a whole</u> indicate that the LTFV imports made a material contribution to the threat of the material injury."  <u>Goss Graphics</u>, 22 CIT at __, 33 F. Supp. 2d at 1090 (emphasis added).  The Commission, in analyzing import factors separately, need only meet the individual factor requirements of § 1677(7)(F)(i)(I-IX); here, for example, that unused capacity and volume increases "indicat[e] the likelihood of substantially increased imports."  In the course of its analysis, the Commission must also meet the "as a whole" requirement of § 1677(7)(F)(ii); that is, it must demonstrate that the domestic industry is threatened with material injury by reason of subject imports themselves, considering the statutory factors as a whole.  That the Commission weaves these various elements of the analysis into the fabric of its threat determination does not mean that it has failed to meet the "by reason of" standard.[12]

---

[12]<u>NEC I</u> emphasized that there is no "'magic words analysis.'"  36 F. Supp. 2d at 393 n.9.  The Commission need not lay out its analysis in some prescribed way, so long as the legal standard is met:  "'A court may "uphold [an agency's] decision of less than ideal clarity if the agency's path may be reasonably discerned."'" <u>Id.</u> (citations omitted) (brackets in original).

## b.   Price Effects

The Court ordered the Commission "to explain how bids involving imports would affect future prices when prices has [sic] not been previously determinative."  NEC I, 22 CIT at __, 36 F. Supp. 2d at 394.   In its Remand Determination, the Commission responded that price is and has always been an important factor,[13] but that "adverse price effects were not significant during the [present material injury] investigation, rather than nonexistent." Remand Determination at 16.    With respect to the threat determination, however, the Commission found that "subject imports are likely to suppress or depress prices to a significant degree in the imminent future."  Remand Determination at 17.

Plaintiffs contest the causal relationship between domestic price declines and imported products.[14]   NEC argues that the

---

[13]The Commission pointed to anecdotal evidence on the record of purchasers' desire to obtain the highest price/performance ratio, and the role price plays in the bidding procedure, to substantiate its finding that "price is a critical factor in all purchasing decisions."  Remand Determination at 14-16 & nn.52-54, 56-57 (citing several confidential Questionnaire responses). Fujitsu produced detailed analysis to show that purchases of Japanese products were made for reasons other than price.  See Fujitsu Remand Cmts. at 11-14.   The record indicates, however, that only one of these purchasers did not consider price at all. In all the other purchases, price appears to have been an important consideration.  See Final Staff Report at V-28 through V-32.

[14]In Taiwan Supercomputers, this Court held that, in order to prove the causal relationship between the underselling of imports and domestic price declines, price declines that may be attributed to other factors must be accounted for. See 23 CIT at __, 59 F. Supp. 2d at 1333.

Commission minimized the price effects of non-import factors, in particular the advance of technology.  See NEC Remand Cmts. at 19-20.  Fujitsu argues that the Commission failed to take into account the price effects of non-vector systems, claiming that competition from aggressively priced non-vector systems is to blame for declines in prices of domestic vector systems.  See Fujitsu Remand Cmts. at 21-27.

The Court disagrees.  First, the Commission did take into account the price effects of non-vector systems at the low to middle end of the market; the Commission found that competition from non-vectors does not significantly affect the high end of the vector market.  See Remand Determination at 17 (citing Final Staff Report at I-22).  Plaintiff Fujitsu challenges this finding, but fails to distinguish between evidence that some non-vector systems are sold at very high prices and evidence that the overlap of markets for non-vector and vector systems, and therefore competition between the two systems, occurs primarily at the low to middle end of the market.[15]

_____

[15]Record evidence indicates that, while non-vector systems did bid for high-value sales for which vector systems also competed, the non-vector bids were largely unsuccessful.  See Final Staff Report at V-8 through V-11 (Table V-2), V-17 through V-19 (Table V-6); see also Def.'s Response to Cmts. on Commission's Remand Determination at 30-31.  The high-value sales actually won by non-vector systems appear to have included bids only from other non-vector producers, or were sole-sourced.  See, e.g., Vector Supercomputers from Japan, Inv. No. 731-TA-750 (Final)(List 2, Doc. 144)(Sept. 5, 1997)(Questionnaire - Purchaser Filed by University A) at 16-18; Vector Supercomputers from Japan, Inv. No. 731-TA-750 (Final)(List 2, Doc. 164)(Sept. 19, 1997)(Questionnaire - Producer Filed by Company A)("Company A Responses") at 2, 5-6.  In light of the Commission's earlier

Second, while NEC is correct that the Commission did not explicitly address the tendency of improved technology to put downward pressure on prices, the Commission did so implicitly by addressing the <u>unnatural</u> downward pressure on prices caused by aggressive pricing of products on technical parity with their competitor. The Commission found that aggressively priced subject imports[16] had been of a lower quality than the domestic product during most of the period of investigation.[17] <u>See</u> Remand Determination at 17. The UCAR sale demonstrated that while the "quality gap" had closed, aggressive pricing continued. <u>See</u> Remand Determination at 18-20 & n.65 ("We believe that a comparison of the initial and final bid data reported by NEC provides a rough indication of the magnitude of the change in the price per GFLOPS.")(quoting <u>Vector Supercomputers from Japan</u>, Inv. No. 731-

---

finding that vector and non-vector systems are not "like products" (Final Determination at 21), the Commission has presented substantial evidence of separate markets for high-value vector and non-vector systems.

[16]The record indicates aggressive pricing of imported products in three out of five bids for which domestic and foreign producers competed. <u>See</u> Final Staff Report at V-27. The domestic producer was forced to lower its prices in at least two of these three instances. <u>See</u> Final Staff Report at V-32; Company A Responses at 25.

[17]NEC and Fujitsu challenge the Commission's finding that Japanese supercomputers became competitive with domestic supercomputers only at the end of the period of investigation. <u>See</u> NEC Remand Cmts. at 16; Fujitsu Remand Cmts. at 20-21. While some record evidence might indicate that performance parity was reached at an earlier point in time, the Court is persuaded that the Commission provided substantial evidence in support of its conclusion. <u>See</u> Remand Determination at 18 & nn.63-64 (citing several confidential Questionnaire responses and Staff Notes).

TA-750 (Final)(List 2, Doc. 169)(Sept. 19, 1997)(Questionnaire - Importer Filed by Company B) at 16; citing Final Staff Report at V-11 (Table V-2)). The Commission concluded from this evidence that price has become a significant distinguishing characteristic between systems of equal quality.  See Remand Determination at 20 & n.71.

Furthermore, the Commission pointed to evidence on the record that key terms of supercomputer contracts, including price and performance values, are often disclosed post-sale to other buyers, both commercial and government, leading to an expectation among buyers of a similar low price for the same performance level in future bids. See Remand Determination at 16 & nn.59-60.  This "lighthouse effect" will have the consequence, as the terms of the UCAR sale become known, of creating an expectation among buyers that similarly performing imports will be offered at that same low price in the future, resulting in further aggressive bidding. See Remand Determination at 20.  The Commission concluded that the prospect of lower prices for similarly performing products reinforces the imminence of increased imports, see discussion supra Part 2.a, while "the aggressive pricing of the significant volume of subject imports is likely to suppress domestic prices to a significant degree."  Id. at 21.

On remand, the Commission addressed the deficiencies of its previous analysis of price effects.  It found on the basis of substantial evidence that market conditions have caused price to become a significant factor, and that post-sale communication of

bid information will reinforce aggressive pricing trends.   The
Court thus upholds the Commission's conclusion that aggressively
priced imports are likely to depress or suppress domestic prices,
and increase demand for subject imports.


###   c.    **Research and Development**


The Commission found that research and development efforts by
the domestic industry are threatened by aggressive pricing and
increased import volumes of Japanese products.   See Remand
Determination at 12-13.   The nature of the industry demands
capital-intensive, continuous technical innovation leading toward
the next generation product. See Remand Determination at 12-13
(citing  Cray Pre-Hearing Br. at 28-30); Final Determination at 46.
The Commission concluded that aggressive pricing and increased
import volumes will make it difficult to pursue next generation
products, since the number of and rate of return on successful bids
will decline. See Remand Determination at 13.

Plaintiff NEC argues that the Commission cannot both claim (1)
that the domestic industry is in a better position to compete since
a major 1995 restructuring program, and (2) that its research and
development efforts are threatened by subject imports.   See NEC
Remand Cmts. at 28-29.   Yet the first claim of the Commission
plainly does not apply to domestic industries competing with LTFV
imports.   It is not incompatible to find that the domestic industry

is in a better position to compete with fairly-traded imports, and that research and development efforts will be negatively affected by a significant increase of aggressively priced imports. The Commission's conclusion regarding research and development follows from its findings on volume, capacity, pricing, and the nature of research and development in the supercomputer industry. The Court holds that the Commission has cited substantial evidence of a causal connection between subject imports and a potential negative effect on research and development.

### d.    Other Relevant Economic Factors

As mentioned above, the Commission considered the contribution of "other factors" in its injury determination, and found <u>no</u> present material injury. On remand, the Commission reconsidered the effects of these "other factors" with regard to the threat determination. In its first step, the Commission concluded that each of the "other factors," while still contributing to some degree to the threatened injury, will decrease in significance in the future. Thus, the contribution of the "other factors" is no longer so great that the contribution of subject imports must necessarily be minimal. In its second step, the Commission re-evaluated the threat of material harm to the domestic industry. It concluded that "other factors" make the domestic industry vulnerable to the effects of subject imports, such that the contribution of the subject imports to the threat of material

injury is more than _de_ _minimis_.

### i.    **Government Spending**

The Commission found that government spending will not decline significantly in the future.  _See_ Remand Determination 9-10.  The Court holds, over NEC's objection to the contrary, _see_ NEC Remand Cmts. at 9-10, that the record evidence supports this finding.  The government market for vector systems is still of substantial volume and value, suggesting that the government has not exited entirely from the supercomputer market. _See_ Final Staff Report at II-1, II-3.  Further, a drastic drop in government spending occurred between 1994 and 1995; thereafter, government spending increased, though not reaching 1994 levels.  _See_ Final Staff Report at II-3.  While the overall decline in government spending during the period of investigation was severe enough to prevent a finding of material injury, the Commission had substantial evidence upon which to conclude that the future effect of this "other factor" will not be the same as the present effect.[18]

### ii.   **Substitution of Non-Vector for Vector Systems**

The Commission found that non-vector systems are not likely to

---

[19]This forward-looking approach "is not the same perspective and may not lead to conclusions reached about material injury to the domestic industry now."  _Bando_, 17 CIT at 804.

cause significantly greater deterioration of the vector market; thus, demand for vector systems will stabilize, and the domestic industry will be less threatened by non-vector systems in the future. See Remand Determination at 10-11. NEC again objects that there is insufficient evidence to support this finding. See NEC Remand Cmts. at 10-13. Again the Court disagrees. The market for vector supercomputers did indeed become smaller during the period of investigation, and is not projected to regain its former size. See Final Staff Report at II-1 through II-3. There is, however, a "core" group of vector applications, see Final Staff Report at II-10 & n.17, for which substitution of a non-vector system is currently technologically and economically impractical. See Final Staff Report at II-17. Further, the Commission found, on the basis of record evidence, that the value of vector supercomputers sold in the U.S. increased and then plateaued at the end of the period of investigation, indicating that the deterioration of the vector market may have diminished somewhat. See Remand Determination at 10 (citing Final Staff Report at C-3). Finally, the Commission cited anecdotal evidence suggesting that projected demand for vector systems is stable. See Remand Determination at 10 (citing Final Staff Report at II-7). The Commission cited sufficient evidence in support of its conclusion that the effects of the substitution of non-vector for vector systems would decline in the future.

### iii. Restructuring Program

Cray, the dominant domestic producer, underwent a massive restructuring program during the period of investigation, "partly in response to the reduction and change in demand for supercomputers." Remand Determination at 11. Based on evidence that these restructuring costs had been absorbed by the end of the period of investigation, however, see Final Staff Report at VI-4, the Commission found that the restructuring program poses no future threat to the domestic industry. See Remand Determination at 11.

### iv.  Vulnerability Analysis

The Commission concluded that the "other factors," while continuing to contribute directly to the threat of material injury, also contribute indirectly insofar as they "render the industry vulnerable to material injury by reason of subject imports." See Remand Determination at 11. Because of the declining government market, the Commission found that the domestic industry will have to compete directly with subject imports in the commercial market for an increased proportion of its sales. See id. at 10; see also supra, note 11. Further, competition from non-vector supercomputers has eroded the low to middle end of the market for vector systems. See Final Staff Report at I-22 through I-23. Competition between domestic and imported vector supercomputers consequently occurs primarily at the high end of the price range for vector systems. See id. The Commission found that, because

each high end sale "has a significant impact on the vendor's revenues," this "other factor" renders the domestic industry vulnerable to injury from an increased volume of aggressively priced subject imports. Remand Determination at 12. Finally, following its restructuring program, "[w]hile Cray has positioned itself to better compete in the marketplace, it has little room to counter the aggressive pricing likely to be presented by the subject imports." See id. at 12.

As noted above, the Court does not disfavor "vulnerability analysis" per se, provided the Commission conducts an "analysis to distinguish between the contribution to material harm caused by LTFV goods and these economic factors unrelated to the subject imports." NEC I, 22 CIT at __, 36 F. Supp. 2d at 392. On remand, the Commission has provided substantial evidence of the causal connection between the subject imports themselves and the threat of material injury to the domestic industry. While it is critical that the Commission consider the contribution of "other factors" to the threatened injury, as it did here, the Commission should not evaluate the contribution of imports as if the domestic industry existed in a vacuum.

## Conclusion

The Commission's affirmative determination of threat of material injury is supported by substantial evidence on the administrative record and otherwise supported by law. Accordingly, the Commission's Remand Determination is affirmed.

_____
Donald C. Pogue
Judge

Dated:     December 17, 1999
           New York, New York

ERRATUM

Slip Op. 99-136, issued December 17, 1999

*NEC Corporation v. U.S.*

This is a consolidated case. Please change the court number to Consol. Ct. No. 97-11-01967.

December 20, 1999