**Slip-Op. 02-105**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| **INDORAMA CHEMICALS (THAILAND) LTD., SINOCHEM INTERNATIONAL FURAN CHEMICALS, ET AL.,** | : : : : : : | |
| **Plaintiffs,** | : : | |
| **v.** | : : | **Consol. Court No. 01-00305** |
| **UNITED STATES INTERNATIONAL TRADE COMMISSION,** | : : : | **BEFORE:  CARMAN, CHIEF JUDGE** **PUBLIC VERSION** |
| **Defendant.** | : : : : | |

[Plaintiffs' motions for judgment upon the agency record are denied.]

Date: September 4, 2002

*Kalik Lewin* (*Martin J. Lewin* and *Adam S. Apatoff*), Washington, D.C., for Plaintiff Indorama Chemicals (Thailand) Ltd.

*Aitken Irvin Berlin & Vrooman, LLP* (*Bruce Aitken*), Washington, D.C., for Plaintiffs Sinochem International Furan Chemicals, *et al*.

*Lyn M. Schlitt*, General Counsel, United States International Trade Commission; *James M. Lyons*, Deputy General Counsel, United States International Trade Commission; *Charles A. St. Charles*, Attorney, Office of the General Counsel, United States International Trade Commission, for Defendant.

## OPINION

**CARMAN, CHIEF JUDGE**: This consolidated action comes before the Court on Plaintiffs'

respective motions for judgment upon the agency record pursuant to USCIT R. 56.2.  Plaintiffs

Indorama Chemicals (Thailand) Ltd. ("Indorama") and Sinochem International Furan Chemicals, *et al.* ("Sinochem") seek review of the International Trade Commission's ("ITC" or "Commission") final affirmative determinations under Section 751(c) of the Tariff Act of 1930 ("the Act"), as amended, 19 U.S.C. § 1675(c) (2000), in the five-year review of the antidumping duty orders on furfuryl alcohol ("FA") from China and Thailand. The ITC determined that revocation of the antidumping duty orders on FA from China and Thailand would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time. *See Furfuryl Alcohol From China and Thailand*, Inv. Nos. 731-TA-703 and 705 (Review) (*Views of the Commission*), USITC Pub. 3412 (April 24, 2001), Prop. List 2, Doc. 50, Def.'s Conf. App. Ex. 6. Notice of the ITC's final determination was published in the Federal Register at 66 Fed. Reg. 21,015 (Apr. 26, 2001) (*Final Determination*). Indorama seeks review of the Commission's determinations with respect to subject imports from Thailand and Sinochem seeks review of the Commission's determination with respect to subject imports from China. Defendant, the International Trade Commission, opposes Plaintiffs' motions. The Court has jurisdiction pursuant to 28 U.S.C. § 1581(c) (2000).

## I. BACKGROUND

On June 14, 1995 and July 18, 1995, the Commission determined that an industry in the United States was materially injured as a result of imports of FA sold at less than fair value ("LTFV") from China and Thailand, respectively. *See Furfuryl Alchohol from the People's Republic of China and South Africa*, Inv. Nos. 731-TA-703 and 704 (Final), USITC Pub. 2897 (June 1995); *Furfuryl Alcohol from Thailand*, Inv. No. 731-TA-705 (Final), USITC Pub. 2909

(July 1999) (collectively "*Original Determinations*").  The Department of Commerce

("Commerce") subsequently published antidumping ("AD") duty orders covering the subject

merchandise.  *See Notice of Antidumping Duty Order:  Furfuryl Alcohol From the People's*

*Republic of China*, 60 Fed. Reg. 32,302 (June 21, 1995) (*China Order*); *Amended Final*

*Antidumping Duty Determination and Order; Furfuryl Alcohol From Thailand*, 60 Fed. Reg.

38,035 (July 25, 1995) (*Thailand Order*) (collectively "*AD Orders*").  In the case of China,

Commerce found margins ranging from 43.54 percent to 50.43 percent.  *See China Order*, 60

Fed. Reg. at 32,302.  In the case of Thailand, Commerce found a single margin of 7.82 percent

for the sole producer, Indorama.  *See Thailand Order*, 60 Fed. Reg. at 38,036.

On May 1, 2000, the Commission instituted five-year sunset reviews pursuant to 19

U.S.C. § 1675(c) to determine whether revocation of the *AD Orders* on imports of FA from

China and Thailand would be likely to lead to continuation or recurrence of material injury.  *See*

*Furfuryl Alcohol From China and Thailand*, 65 Fed. Reg. 25,363 (Int'l Trade Comm'n May 1,

2000).  On August 3, 2000, the Commission decided to conduct full reviews with respect to the

*AD Orders*.[1]

In the original investigation, the ITC defined the domestic industry as including a single

company - QO Chemicals.  In the five-year review, the Commission defined the domestic

industry as including Great Lakes Chemical Corporation ("Great Lakes"), its successor in

interest, Penn Specialty Chemicals, Inc. ("Penn"), which produces the like product for open

---

[1] A full review includes a public hearing, the issuance of questionnaires, and other
procedures.  Expedited reviews do not include such procedures.  *See* 19 U.S.C. § 1675(C)(3); 19
C.F.R. §§ 207.62 - 207.58 (2000).

market sales and internal consumption and toll produces for [[

]], and Ferro Industries, which toll-produced for [[                              ]]. *See Views of the Commission* at 5-6. The foreign industries in the five-year review included, 1) with respect to subject imports from Thailand, Indorama, the sole producer of the subject merchandise in Thailand, and, 2) with respect to subject imports from China, Sinochem International Furan Chemicals Co., Ltd., Shandong Zhucheng Chemical Co., Ltd., Shandong Baofeng Chemicals Group, Corp., Linzi Organic Chemical Inc., Jilin Sanchun Chemical Plant Co., Ltd., Sinochem Hebei Fuheng Co., Ltd., Shanxi Province Gaoping Chemical Industry Co., Ltd., Qingdao Import and Export Corp., and the China Chamber of Commerce of Metals, Minerals, and Chemicals, Chinese producers and exporters of the subject merchandise (collectively "Sinochem"). *See id.*

Pursuant to 19 U.S.C. § 1675a(a)(7), the Commission elected to cumulate likely volume and price effects from China and Thailand after finding that the reviews of the *AD Orders* were (1) initiated on the same day; (2) the subject imports from each country would be likely to have a discernible adverse impact on the domestic industry if the *AD Orders* were revoked; and (3) there would likely be a reasonable overlap of competition among the subject imports from the two countries and the domestic like product in a reasonably foreseeable time. *See id.* at 8-13. On April 24, 2001, the ITC concluded that revocation of the *AD Orders* on imports of FA from China and Thailand, considered cumulatively, would be likely to lead to continuation or recurrence of material injury to the domestic FA industry within a reasonably foreseeable time. *See id.* at 13-25. Therefore, the *AD Orders* remain in place. *See* 19 U.S.C. § 1675(d)(2).

Plaintiffs challenge the following ITC determinations: (1) the Commission's decision to

cumulate imports from China and Thailand; and (2) the Commission's determination that revocation of the *AD Orders* on imports from China and Thailand is likely to result in a continuation or recurrence of material injury.

## II. STANDARD OF REVIEW

This Court must sustain the Commission's determination in a full five-year review unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The possibility of drawing two inconsistent conclusions from the [same] evidence does not" mean that the agency's finding is unsupported by substantial evidence. *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966). The Commission's determination will not be overturned merely because the plaintiff "is able to produce evidence . . . in support of its own contentions and in opposition to the evidence supporting the agency's determination." *Torrington Co. v. United States*, 745 F. Supp. 718, 723 (1990) (internal quotation omitted), *aff'd*, 938 F.2d 1276 (Fed. Cir. 1991).

## III. DISCUSSION

**A.    The Commission's Decision to Cumulate Subject Imports From China and Thailand Was Supported by Substantial Evidence on the Record and Otherwise in Accordance With Law**

1.    Contentions of the Parties

(a)    *Plaintiff Indorama*

Plaintiff Indorama contends the ITC's decision to cumulate subject imports from China and Thailand is unsupported by substantial evidence, or otherwise not in accordance with law. Indorama argues the Commission erred in (1) determining that subject imports from Thailand would be likely to have a "discernible adverse impact" on the domestic industry if the order against subject imports from Thailand were revoked, and (2) finding a reasonable overlap of competition likely would exist between the subject imports from Thailand and the domestic like product if the order were revoked.

(i) Discernible Adverse Impact

Indorama contends the factors cited by the Commission to support its determination do not establish that revocation of the *AD Orders* would have a discernible adverse impact on the domestic industry. Specifically, Indorama questions the Commission's reliance on the Thai industry's large production capacity relative to the U.S. market, export orientation, and significant U.S. market share. Indorama argues the mere ability of the foreign industry to increase exports to the U.S. and the fact the foreign industry is "export oriented" do not demonstrate that revocation of an order against imports of that industry would have an adverse impact.

Instead, Indorama contends despite the presence of the *AD Orders*, the record shows the

Thai producer had been selling into the U.S. FA market [[

]].[2]  Additionally, Indorama contends the [[

]].  Further, Indorama notes the record established that as the sole

Thai producer, Indorama [[

]].  Finally, Indorama contends there is [[

]].

(ii)  Reasonable Overlap of Competition

Indorama makes two arguments in support of its contention that the Commission erred in

finding a reasonable overlap of competition between the subject imports from Thailand and the

domestic like product likely would exist if the order were revoked:  (1) the U.S. market for FA is

more segmented than it was during the original investigation; and (2) FA imported from Thailand

and domestic FA do not compete in the U.S. market.

Indorama argues that at the time of the original investigation, the domestic producer sold

FA to all segments of the U.S. market - both large producers that used FA to produce furan

resins, as well as smaller wholesalers and specialty distributors.  Indorama notes that the market

_____

[2] [[

]] *See* Prehearing Staff Report at IV-4, Indorama's Conf. App.
Ex. 2 at 5.

structure for FA in the U.S. has changed dramatically over the life of the *AD Orders*. As a result, Indorama asserts, imports from Thailand currently supply the requirements for [[

]], while the domestic producer, however, competes solely in the smaller wholesaler and specialty distributor market.

Indorama argues that the Commission erred when it concluded there was likely to be a reasonable overlap of competition because its conclusion was based solely on the domestic producer's assertion that it [[

]].[3] Indorama asserts the record strongly suggests that the domestic producer is neither interested nor able to sell into this market segment. Instead, Indorama urges, the domestic producer has maintained a three-pronged strategy of focusing on internal consumption of FA for its primary derivatives business, tolling FA, and selling to small distributors. This practice has served the domestic producer very well, Indorama argues, therefore there is no incentive for the domestic producer to change this [[                ]] and well-performing business strategy and end the tolling agreement.

(b)    *Plaintiff Sinochem*

Because the Court finds Sinochem's arguments in this matter substantially similar to

---

[3] Generally, under a tolling arrangement the tollee supplies raw material to the toller, which produces the product for a fee. Usually, the tollee pays to the toller only a fabrication fee and the price of the materials it did not supply. *See, e.g., Brass Sheet and Strip from France, Italy, Sweden and West Germany*, Inv. No. 701-TA-270 (Final), 731-TA-311, 312, and 315 (Final), USITC Pub. 1930 (Dec. 1986).

those presented by the Indorama, the Court will not recount them in this opinion, although they have been duly considered.

    (b)    *Defendant*

Defendant contends the Commission's exercise of discretion to cumulate imports from China and Thailand was supported by substantial evidence on the record and otherwise in accordance with law. Defendant contends the Commission correctly found that revocation of the *AD Orders* would likely have a discernible adverse impact on the domestic industry, and that sales of the domestic like product and subject imports would likely overlap within a reasonably foreseeable time.

        (i) Discernible Adverse Impact

Defendant argues Indorama ignores the standard of review and is seeking to have this Court reweigh the record evidence. Defendant outlines the multiple findings upon which the Commission based its affirmative determination, asserting that Plaintiffs do not contest the majority of those findings.

Defendant then makes three arguments refuting Indorama's main contentions. First, Defendant refutes Indorama's contention that "export orientation" and export shifting alone are not enough to support a finding of discernible adverse impact. Defendant points to the multiple findings made by the Commission to demonstrate it did not base its discernible adverse impact determination "solely" upon the findings that the Thai producer is export oriented and has demonstrated an ability to increase exports to the U.S. Defendant also argues that the pattern of imports from Thailand supports a finding that the Thai producers are able to shift their exports among various export markets. The ITC notes this Court has expressly affirmed the

Commission's reliance upon subject producers' strong export orientation and ability to increase exports to the U.S. in assessing the likely potential volume of subject imports in the context of a threat of material injury determination. Defendant posits, therefore, because the Commission was operating under the "imminent" threat standard in the case affirmed by this Court, it follows that the finding of likely increased imports would be supported here in a five-year review where the Commission is operating under the "reasonably foreseeable time" standard.

Second, Defendant refutes Indorama's assertion that its exports have been constant since the AD duty order was issued, arguing that it simply is not true. Defendant argues even the incorrect data offered by Indorama demonstrate [[            ]] fluctuations in imports from Thailand from year to year and a [[            ]] increase for the final two years of the four year period, further highlighting Indorama's ability to shift exports.

Third, Defendant contends the record supports the Commission's finding that unit values of the Thai product were consistently lower than the domestic unit values throughout the period of review. Defendant notes product fungibility and the importance of price have allowed the low-priced subject imports from Thailand to capture a significant share of the U.S. market since 1998. Based upon this, Defendant argues, the Commission correctly concluded that in the event of revocation of the order, Thai producers have considerable incentive to enter the U.S. market and engage in aggressive pricing to recapture market share. Contrary to Indorama's objections, Defendant asserts the Commission reasonably relied upon average unit value data for the domestic and Thai product in the Commission staff report because FA is a commodity product sold in a single grade. Defendant notes Indorama's objections to the price/quantity differences between the Thai and domestic like product focus on the Commission's consideration of

domestic producers other than the current domestic producer, Penn. Defendant asserts 19 U.S.C. § 1677(4)(A) authorizes the Commission to examine the average unit values of all the domestic producers over the five-year period of review, not just the current domestic producer, Penn. Defendant argues that the quantity differences cited by Indorama are not sufficient to demonstrate that the average unit values relied upon by the Commission are invalid for the purpose of the Commission's discernible adverse impact determination.

Finally, Defendant argues Indorama's suggestion that there can be no discernible adverse impact in this case because the U.S. industry [[

]] is simply not persuasive. Defendant contends the fact that the U.S. industry [[

]] reinforces rather than undermines the reasonableness of the Commission's finding that removal of the order would have a discernible adverse impact on the domestic industry.

   (ii)  Reasonable Overlap of Competition

Defendant argues the Commission's finding regarding likely channels of distribution is supported by substantial record evidence. Defendant notes Indorama speaks extensively of the ways in which the U.S. industry today differs from the U.S. industry at the time of the original investigation (i.e., it is more segmented today). Defendant concedes that the industry and its participants have changed over time. Defendant contends, however, that Indorama fails to indicate any ways in which that fact affects the substantiality of the evidence supporting the Commission's determination.

Defendant argues that the Commission correctly determined that the Thai product is sold exclusively to large end users. Defendant also asserts that the Commission correctly found that

although only a small volume of the domestic like product is currently sold to end users,

abundant record evidence indicated Penn intends [[

                                                                                                    ]].

Thus, Defendant contends, the Commission's conclusion that both the domestic like product and

subject imports are likely to compete directly for sales to end users in the reasonably foreseeable

future is supported by the record.

>    2.    Analysis

>    Section 752(a) of the Act, as amended, sets forth the requirements for cumulation:

>    For purposes of this subsection, the Commission may cumulatively assess the volume and
>    effect of imports of the subject merchandise from all countries with respect to which
>    reviews under section 1675(b) or (c) of this title were initiated on the same day, if such
>    imports would be likely to compete with each other and with domestic like products in
>    the United States market.  The Commission shall not cumulatively assess the volume and
>    effects of imports of the subject merchandise in a case in which it determines that such
>    imports are likely to have no discernible adverse impact on the domestic industry.

19 U.S.C. § 1675a(a)(7).  Cumulation is discretionary in sunset reviews, even if the Commission

determines that the subject imports would be likely to compete with each other and with

domestic like products in the United States market.  *See* 19 U.S.C. § 1675a(a)(7) ("[T]he

Commission *may* cumulatively assess the volume and effect of imports . . . .") (emphasis added);

*see also Eveready Battery Co. v. United States*, 77 F. Supp. 2d 1327, 1331 (Ct. Int'l Trade 1999);

Statement of Administrative Action, ("SAA") accompanying H.R. Rep. No. 103-826, at 887,

*reprinted in* 1994 U.S.C.C.A.N. 4040, 4212.  The statute prohibits cumulation, however, if the

Commission determines that imports of subject merchandise are likely to have "no discernible

adverse impact" on the domestic industry.  19 U.S.C. § 1675a(a)(7).  In addition to these

statutory requirements the Commission analyzes the "overall similarities in the conditions of competition that would prevail if the finding and orders are revoked." *Certain Steel Wire Rope from Japan, Korea, and Mexico*, USITC Pub. 3259, Inv. Nos. 731-TA-547, at 11 (Dec. 1999).

> (a)     *Discernible Adverse Impact*

The logical starting point for a cumulation discussion is "discernible adverse impact," because the Commission may not cumulatively assess the volume and effects of subject imports if it determines that such imports are "likely to have no discernible adverse impact on the domestic industry." 19 U.S.C. § 1675a(a)(7). Noting that neither the statute nor the SAA provide specific guidance on what factors the Commission is to consider in making this determination, the Commission states it "generally considers the likely volume of the subject imports and the likely impact of those imports on the domestic industry within a reasonably foreseeable time if the orders are revoked." *Views of the Commission* at 7.

The Commission concluded that "subject imports from [China and Thailand] would enter the U.S. market in sufficient quantities and at sufficiently low prices such that they would . . . likely have [a] discernible adverse impact on the domestic industry." *Id.* at 10. The Commission made the following findings in support of its conclusion. With respect to conditions of competition: First, FA is a fungible commodity. *See id.* at 16. Second, the U.S. is the world's largest FA market. *See id.* at 17. Third, U.S. prices are higher than world prices. Despite an overall increase in the supply of FA and stagnant demand, U.S. prices have not declined as much as prices in the world market. *See id.* Fourth, three purchasers dominate the market and account for [[54]] percent of the apparent U.S. consumption in 2000. *See id.* Fifth, both the three largest purchasers and the smaller purchasers base their purchasing decisions primarily on price. *See id.*

With respect to volume and impact:  First, industry capacity in Thailand has grown since the original investigations and is [[          ]] to U.S. apparent consumption, while industry capacity in China has remained sizeable and [[          ]] U.S. apparent consumption.[4] *See id.* Second, the FA industries in both China and Thailand devote considerable resources to export markets.  In 2000, 57.5 percent of total shipments of FA were exported from China, while the comparable figure for Thailand was [[     ]] percent.  In 2000, subject imports from Thailand had a [[    ]] percent share of the value of the U.S. market.  *See id.* at 9-10, 19-20.  Third, subject producers have demonstrated an ability to shift exports between different markets, including between third country markets and the U.S. market.  *See id.* at 20.   Fourth, average unit values were consistently lower than the domestic unit values during the period of review.  *See id.* at 21.

Upon review, the Court finds that the Commission's conclusion that Thai and Chinese imports of subject merchandise would have a discernible adverse impact on the domestic industry is supported by substantial evidence on the record.

Plaintiffs make several arguments in an attempt to persuade the Court that the Commission's determination is unsupported by substantial evidence.  Plaintiffs, however, do not assert that the evidence upon which the Commission relied was not "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *See Universal Camera Corp. v. United States*, 340 U.S. 474, 477 (1951).  Rather, the Plaintiffs request a reweighing of

---

[4] In 1994, production capacity in Thailand was [[     ]] million pounds.  In 2000, it had increased to [[    ]] million pounds. *See Views of the Commission* at 9 n.32 (citing Confidential Final Staff Report at IV-3, IV-4, Def.'s Conf. App. Ex. 5.).  For the five responding Chinese producers, capacity has also grown over the last few years, from 49.3 million pounds in 1996 to 54.5 million pounds in 2000. *See id.* at 19 n.85.  By contrast, apparent U.S. consumption of FA in 2000 was [[    ]] million pounds. *See id.* at 9 n.32.

the evidence.

Indorama's assertion that export orientation and ability to shift exports are not in themselves sufficient to support a finding of discernible adverse impact is without merit. As demonstrated above, the Commission clearly relied upon multiple findings in making its determination - the majority of which Indorama does not contest.

In an apparent attempt to minimize the Commission's finding with regard to its shifts in and out of the U.S. market, Indorama contends that its exports to the U.S. have been constant since the *AD Orders* were issued. However, as Defendant notes, this is simply untrue. Indorama exited the U.S. market in 1995 and 1996, immediately after the issuance of the *AD Orders*, and then resumed [[          ]] levels in 1998. *See Conf. Final Staff Report* at Table I-1, Def.'s Conf. App. Ex. 5 at 7.

The Court finds, contrary to Indorama's arguments, that there is substantial evidence supporting the Commission's findings that unit values of the Thai product were consistently lower than the domestic unit values throughout the period of review. The Commission reasonably relied upon average unit value ("AUV") data for the domestic and Thai product, explaining that average unit value data provide a reliable basis for price comparisons because FA is a fungible commodity product sold in a single grade. *See Views of the Commission* at 21 n.97. A comparison of the average unit values clearly illustrates the Commission's finding: The average unit value per pound of U.S. shipments of the domestic product was $[[     ]] in 1998, $[[    ]] in 1999, and $[[    ]] in 2000, while the average unit value of shipments of the subject product from Thailand was $[[     ]] in 1998, $[[     ]] in 1999, and $[[       ]] in 2000. *See Conf. Final Staff Report* at Table I-1 and App. C-1.

Indorama suggests that its lower unit values are due to the fact that it sells to end users (implying larger quantities and quantity discounts) whereas Penn's sales to end users are limited. These arguments are also without merit. The Commission examined the average unit values for the entire domestic industry,[5] not just Penn's commercial sales, a practice wholly consistent with the statute's focus on producers as a whole. *See* 19 U.S.C. § 1677(4)(A). Furthermore, Indorama does not allege that the unit values used by the Commission were incorrect or not reflective of real prices. Indorama's arguments neither allege nor meet its burden to "show, by hard evidence, that in this case falling AUV's are not representative of falling prices." *U.S. Steel Group v. United States*, 96 F.3d 1352, 1366 (Fed. Cir. 1996).

Finally, the Court rejects Indorama's suggestion that the Commission's discernible adverse impact determination cannot occur because the U.S. industry [[

]]. The fact that the industry is [[

]] has no bearing on whether it will be [[            ]] if the order is revoked. Additionally, the Commission noted that performance indicators for the domestic industry were mixed in the last three years, contributing to the conclusion that if the order were revoked, the imports from Thailand would be likely to have a discernible adverse impact on the domestic industry within a reasonably foreseeable time. For the foregoing reasons this Court holds the Commission's discernible adverse impact determination was supported by substantial

---

[5] Consistent with this, the average unit values of the domestic product did in fact include sales to end users. For example, [[

]]. *See* Penn Specialty Chemicals, Inc. Producer Questionnaire (Jan. 9, 2001), Prop. List 2, Doc. 90, at 6, Def.'s Conf. App. Ex. 9 at 2.

evidence on the record and is otherwise in accordance with law.


>    (b)    *Reasonable Overlap of Competition*

The Commission generally considers the following four factors in order to determine

whether overlap of competition is likely:

>    (1) the degree of fungibility between the imports from different countries and between
>    imports and the domestic like product;
>    (2) the presence of sales or offers to sell in the same geographical markets of imports
>    from different countries and the domestic like product;
>    (3) the existence of common or similar channels of distribution for imports from different
>    countries and the domestic like product; and
>    (4) whether the imports are simultaneously present in the market.

*See U.S. Steel Group - A Unit of USX Corp. v. United States*, 873 F. Supp. 673, 685 (Ct. Int'l

Trade 1994), *aff'd*, 96 F.3d 1352 (Fed. Cir. 1996); *Fundicao Tupy, S.A. v. United States*, 678 F.

Supp. 898, 902 (Ct. Int'l Trade 1988), *aff'd*, 859 F.2d 915 (Fed. Cir. 1988); *see also* SAA at 848

(citing with approval the analysis in *Fundicao Tupy*.).  These factors are neither exclusive nor

determinative.  *See Goss Graphics Sys., Inc. v. United States*, 33 F. Supp. 2d 1082, 1086 (Ct.

Int'l Trade 1998).  In finding that overlap of competition is likely, the Commission made

affirmative determinations as to each factor.  *See Views of the Commission* at 10-12.  Indorama

challenges only the finding relative to the third factor, channels of distribution.

The Commission concluded that "in the reasonably foreseeable future both the domestic

like product and subject imports are likely to compete directly for sales to end users."  *Id.* at 11.

In making this determination, the Commission found that Thai subject imports are sold directly

to end users.  *See id.*  The Commission also found that while subject imports from China ceased

immediately after the imposition of the *AD Orders*, subject imports from both China and

Thailand had been sold to end users during the original investigation. Therefore, the Commission concluded that if China returned to the U.S. market, they would likely sell to end users. *See id.* In relation to the domestic like product, the Commission found that while only a small volume is currently being sold to end users, the domestic producer Penn had [[

]]. *See id.*

The Court finds there is substantial evidence on the record to support the Commission's conclusion that the domestic like product and subject imports are likely to compete directly for sales to end users in a reasonably foreseeable time. While forcefully made, Indorama's arguments ask this Court to reweigh the record evidence and step into the shoes of the Commission, an invitation the Court declines to accept. Indorama's contention revolves around whether Penn will actually [[                                              ]].

It is uncontested that Penn toll produces for another company, [[     ]]. *See Conf. Final Staff Report* at I-12, Def.'s Conf. App. Ex. 5. But the record also demonstrates that Penn entered into this agreement because it was unfamiliar with the FA industry and needed some time to gain familiarity. Penn's Vice President testified that he and his partners knew little about the FA market when it acquired the business from Great Lakes in 1999 and viewed itself fortunate "to have this tolling opportunity to keep things moving along." Hr'g Tr. (March 1, 2001), at at 59, 60, Public List 1, Doc. 56, Def.'s Public App. Ex. 2. Penn's equity partners were "looking for something to buy a little bit of time to understand and be able to dig into some of these fine chemicals and solvents, furfuryl alcohol being one of them, and understand what [they] knew was a fairly complex market and a very global market indeed." *Id*. at 60. "Toll production

allowed the company time to understand the market before it fully availed itself of the production and sales opportunities of furfuryl alcohol." *Conf. Final Staff Report* at III-1.

There is also record evidence that [[

]].  Penn's witness indicated at the hearing that [[

]].  Hr'g Tr. (March 1, 2001), at 155, Prop. List 2, Doc. 22, Def.'s Conf. App. Ex. 1.  Indorama contends Penn is not likely to [[                                                                     ]] for them.  Penn's witness testified, however, that [[

]] *Id*.  Furthermore, it would appear logical that if the tolling arrangement in itself is [[          ]] for Penn, that it would be just [[

]].  As Penn's witness noted at the hearing, [[

]] *Id.*

Finally, the domestic like product that Penn toll produces for [[

]]. *See id.* at 173, 177.  [[       ]] importer questionnaire response

[[

]]:  [[

]]  Producer's Questionnaire, [[                    ]] (Jan. 8, 2001), Prop. List 2,

Doc. 68, Def.'s Conf. App. Ex. 7, at 2 (emphasis in original).

This Court finds the Commission's determination that there likely will be a reasonable

overlap of distribution channels is supported by substantial evidence on the record.  This Court

holds the Commission's determination that there will likely be a reasonable overlap of

competition between the domestic like product and the subject imports in a reasonably

foreseeable time is supported by substantial evidence on the record and otherwise in accordance

with law.

**B.      The Commission's Determination That Revocation of the *AD Orders* Would be
          Likely to Lead to Continuation or Recurrence of Material Injury Within a
          Reasonably Foreseeable Time is Supported by Substantial Evidence on the Record
          and Otherwise in Accordance With Law**

In five-year sunset reviews, the Commission "shall determine whether revocation of an

order . . . would be likely to lead to continuation or recurrence of material injury within a

reasonably foreseeable time."  19 U.S.C. § 1675a(a)(1).  In making this determination the

Commission is directed to "consider the likely volume, price effect, and impact of imports of the

subject merchandise if the order is revoked . . . ."  *Id*.  Plaintiffs challenge the Commission's

affirmative determination as to each.

The Court notes at the outset that the standard is based on a "likelihood" of continuation

or recurrence of injury, not a certainty.  The SAA makes this clear:

> There may be more than one likely outcome following revocation or termination. The possibility of other likely outcomes does not mean that a determination that revocation or termination is likely to lead to continuation or recurrence of . . . injury, is erroneous, as long as the determination of likelihood of continuation or recurrence is reasonable in light of the facts of the case. In such situations, the order . . . will be continued.

SAA at 883. The Plaintiffs appear to ignore this standard in their arguments, again arguing that the record evidence points to the possibility of an outcome contrary to the one determined by the Commission.

After evaluating the statutory factors, the Commission concluded that revocation of the *AD Orders* on import of FA from China and Thailand would be likely to lead to continuation or recurrence of material injury to the U.S. FA industry within a reasonably foreseeable time. For the reasons that follow, the Court finds this determination to be supported by substantial evidence and otherwise in accordance with law.

        1.     *Volume*

The Commission determined that likely volume of cumulated imports from China and Thailand would be significant within a reasonably foreseeable time if the orders were revoked. The Commission found that revocation of the orders, which caused cumulated subject import volumes to decline since the time of the original investigations, would create an incentive for subject producers to shift or continue to shift exports from third countries, where demand is stagnant, to the U.S., the world's largest market. *See Views of the Commission* at 20.

Indorama's objections here focus only on imports from Thailand, ignoring that the Commission made its volume determination on a cumulated basis. As the Court stated in its discernible adverse impact discussion above, the Commission's determination with respect to likely volume from Thailand was supported by substantial evidence on the record.

Indorama makes a supplemental claim that the order has not been a barrier to imports from Thailand.  This claim is inaccurate.  As noted earlier, the Commission found that there were no subject imports from Thailand in 1995, 1996, or 1997.  *See Conf. Final Staff Report* at Table I-1.  When imports resumed in 1998, they were still at a level [[        ]] below the 1994, pre-order level.  *See id.*  The increase in 1999 and in 2000 support the finding that Indorama has a demonstrated ability to shift among export markets.  Indorama also argues it has no excess production capacity, but that was also true in 1999 and 2000, years in which Indorama [[            ]] increased exports to the U.S. notwithstanding [[

]].  *See id.* at IV-4.  Finally, Indorama's claim that it has a diversified global export base is consistent with the Commission's finding that Indorama has the ability and incentive to direct to the U.S. exports currently directed elsewhere.

2.      *Price Effects*

The Commission determined that if the *AD Orders* are revoked, the cumulated subject imports would be priced at levels that would likely have significant price depressing or suppressing effects on the domestic like product.  *See Views of the Commission* at 21-22.  In support of that conclusion, the Commission found that the current underselling by the Thai product, and the price effects observed during the original investigations, coupled with the stagnant demand for FA worldwide, provide considerable incentive to the Thai and Chinese producers to enter the U.S. market and engage in aggressive pricing to recapture market share.  This would result in increased pressure on the U.S. producers to either reduce or suppress prices or lose market share.  *See Views of the Commission* at 21.

Once again, Indorama's arguments are based upon imports from Thailand alone, not on a

cumulated basis. As the Court stated in its discernible adverse impact discussion above, the Commission's determination with respect to price effects from China and Thailand was supported by substantial evidence on the record and otherwise in accordance with law.

      3.    *Likely Impact*

The Commission determined that the volume and price effects of the cumulated subject imports would have a likely significant negative impact on the domestic industry's prices and would likely cause the domestic industry to lose market share. *See Views of the Commission* at 23. Supporting this conclusion, the Commission noted that in the original determination it had found that increased volume and market share of the subject imports depressed U.S. prices and led to the U.S. industry's loss of market share. *See id.* at 22. Following the imposition of the *AD Orders*, the domestic industry's performance improved significantly. For example, the domestic industry's market share increased from [[    ]] percent in 1994 to [[   ]] percent in 1996. *Conf. Final Staff Report* at Table I-1. Additionally, the domestic industry's capacity utilization rate increased from [[   ]] percent in 1994 to [[   ]] percent in 1996. *See id.* However, as noted in the discernible adverse impact discussion, in the last three years, consistent with Indorama's reentrance into the market, the indicator's for the domestic industry's condition have been mixed, indicating an impact by the imports.

    Indorama's arguments are based upon imports from Thailand alone, not on a cumulated basis. As the Court stated in its discernible adverse impact discussion above, the Commission's determination with respect to likely impact of imports from China and Thailand was supported by substantial evidence on the record and otherwise in accordance with law.

### CONCLUSION

For the reasons stated above, the Court finds the Commission's *Final Determination* is supported by substantial evidence and otherwise in accordance with law. Plaintiffs' motions are denied. This consolidated action is dismissed.


_____
Gregory W. Carman,
Chief Judge


Dated: September 4, 2002
       New York, New York

**ERRATA**

*Indorama Chemicals (Thailand) Ltd., Sinochem International Furan Chemicals, et al., v. United States International Trade Commission*, Consol. Court No. 01-00305, PUBLIC VERSION, Slip Op. 02-105, dated September 4, 2002.

- Page 24, Line 511: Delete the words, "Dated: September 4, 2002" and replace with "Signed: February 4, 2003"

- Page 24, Line 511: Insert the words, "Effective: September 4, 2002" after the words, "Signed: February 4, 2003"

February 7, 2003